PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LIBERTY UNIVERSITY, INCORPORATED,
a Virginia Nonprofit Corporation;
MICHELE G. WADDELL; JOANNE V.
MERRILL,

      *Plaintiffs-Appellants,*

      and

MARTHA A. NEAL; DAVID STEIN,
M.D.; PAUSANIAS ALEXANDER;
MARY T. BENDORF; DELEGATE
KATHY BYRON; JEFF HELGESON,

      *Plaintiffs,*

      v.

TIMOTHY GEITHNER, Secretary of
the Treasury of the United States,
in his official capacity; KATHLEEN
SEBELIUS, Secretary of the United
States Department of Health and
Human Services, in her official
capacity; HILDA L. SOLIS, Secretary
of the United States Department of
Labor, in her official capacity;
ERIC H. HOLDER, JR., Attorney
General of the United States, in
his official capacity,

      *Defendants - Appellees.*

No. 10-2347

MOUNTAIN STATES LEGAL
FOUNDATION; REVERE AMERICA
FOUNDATION,

*Amici Supporting Appellants,*

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA, INCORPORATED; AMERICAN
NURSES ASSOCIATION; AMERICAN
ACADEMY OF PEDIATRICS,
INCORPORATED; AMERICAN MEDICAL
STUDENT ASSOCIATION; CENTER FOR
AMERICAN PROGRESS, d/b/a Doctors
for America; NATIONAL HISPANIC
MEDICAL ASSOCIATION; NATIONAL
PHYSICIANS ALLIANCE; HARRY REID,
Senate Majority Leader; NANCY
PELOSI, House Democratic Leader;
DICK DURBIN, Senator, Assistant
Majority Leader; CHARLES
SCHUMER, Senator, Conference
Vice Chair; PATTY MURRAY,
Conference Secretary; MAX
BAUCUS, Senator, Committee on
Finance Chair; TOM HARKIN,
Senator, Committee on Health,
Education, Labor and Pensions
Chair;

PATRICK LEAHY, Senator, Committee on the Judiciary Chair; BARBARA MIKULSKI, Senator, HELP Subcommittee on Retirement and Aging Chair; JOHN D. ROCKEFELLER, IV, Senator, Committee on Commerce Chair; STENY HOYER, Representative, House Democratic Whip; JAMES E. CLYBURN, Representative, Democratic Assistant Leader; JOHN B. LARSON, Representative, Chair of Democratic Caucus; XAVIER BECERRA, Representative, Vice Chair of Democratic Caucus; JOHN D. DINGELL, Representative, Sponsor of House Health Care Reform Legislation; HENRY A. WAXMAN, Representative, Ranking Member, Committee on Energy and Commerce; FRANK PALLONE, JR., Representative, Ranking Member, Commerce Subcommittee on Health; SANDER M. LEVIN, Representative, Ranking Member, Committee on Ways and Means; FORTNEY PETE STARK, Representative, Ranking Member, Ways and Means Subcommittee on Health;

ROBERT E. ANDREWS, Representative, Ranking Member, Education and Workforce Subcommittee on Health; JERROLD NADLER, Representative, Ranking Member, Subcommittee on Constitution; GEORGE MILLER, Representative, Ranking Member, Education and the Workforce Committee; JOHN CONYERS, JR., Representative, Ranking Member, Committee on the Judiciary; JACK M. BALKIN, Knight Professor of Constitutional Law and the First Amendment, Yale Law School; GILLIAN E. METZGER, Professor of Law, Columbia Law School; TREVOR W. MORRISON, Professor of Law, Columbia Law School; AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES; THE ARC OF THE UNITED STATES; BREAST CANCER ACTION; FAMILIES USA; FRIENDS OF CANCER RESEARCH; MARCH OF DIMES FOUNDATION; MENTAL HEALTH AMERICA; NATIONAL BREAST CANCER COALITION; NATIONAL ORGANIZATION FOR RARE DISORDERS; NATIONAL PARTNERSHIP FOR WOMEN AND FAMILIES; NATIONAL SENIOR CITIZENS LAW CENTER; NATIONAL WOMEN'S HEALTH NETWORK; THE OVARIAN CANCER NATIONAL ALLIANCE;

AMERICAN HOSPITAL ASSOCIATION;
ASSOCIATION OF AMERICAN MEDICAL
COLLEGES; FEDERATION OF
AMERICAN HOSPITALS; NATIONAL
ASSOCIATION OF PUBLIC
HOSPITALS AND HEALTH SYSTEMS;
CATHOLIC HEALTH ASSOCIATION OF
THE UNITED STATES; NATIONAL
ASSOCIATION OF CHILDREN'S
HOSPITALS; CHRISTINE O. GREGOIRE,
Governor; DR. DAVID CUTLER,
Deputy, Otto Eckstein Professor of
Applied Economics, Harvard
University; DR. HENRY AARON,
Senior Fellow, Economic Studies
Bruce and Virginia MacLaury
Chair, The Brookings Institution;
DR. GEORGE AKERLOF, Koshland
Professor of Economics,
University of California-Berkeley,
2001 Nobel Laureate; DR. STUART
ALTMAN, Sol C. Chaikin Professor
of National Health Policy,
Brandeis University; DR. KENNETH
ARROW, Joan Kenney Professor of
Economics and Professor of
Operations Research, Stanford
University 1972 Nobel Laureate;
DR. SUSAN ATHEY, Professor of
Economics, Harvard University,
2007 Recipient of the John Bates
Clark Medal for the most
influential American economist
under age 40;

DR. LINDA J. BLUMBERG, Senior Fellow, The Urban Institute, Health Policy Center; DR. LEONARD E. BURMAN, Daniel Patrick Moynihan Professor of Public Affairs at the Maxwell School, Syracuse University; DR. AMITABH CHANDRA, Professor of Public Policy Kennedy School of Government, Harvard University; DR. MICHAEL CHERNEW, Professor, Department of Health Care Policy, Harvard Medical School; DR. PHILIP COOK, ITT/Sanford Professor of Public Policy, Professor of Economics, Duke University; DR. CLAUDIA GOLDIN, Henry Lee Professor of Economics, Harvard University; DR. TAL GROSS, Department of Health Policy and Management, Mailman School of Public Health, Columbia University; DR. JONATHAN GRUBER, Professor of Economics, MIT; DR. JACK HADLEY, Associate Dean for Finance and Planning, Professor and Senior Health Services Researcher, College of Health and Human Services, George Mason University;

DR. VIVIAN HO, Baker Institute Chair in Health Economics and Professor of Economics, Rice University; DR. JOHN F. HOLAHAN, Director, Health Policy Research Center, The Urban Institute; DR. JILL HORWITZ, Professor of Law and Co-Director of the Program in Law & Economics, University of Michigan School of Law; DR. LAWRENCE KATZ, Elisabeth Allen Professor of Economics, Harvard University; DR. FRANK LEVY, Rose Professor of Urban Economics, Department of Urban Studies and Planning, MIT; DR. PETER LINDERT, Distinguished Research Professor of Economics, University of California, Davis; DR. ERIC MASKIN, Albert O. Hirschman Professor of Social Science at the Institute for Advanced Study, Princeton University, 2007 Nobel Laureate; DR. ALAN C. MONHEIT, Professor of Health Economics, School of Public Health, University of Medicine & Dentistry of New Jersey; DR. MARILYN MOON, Vice President and Director Health Program, American Institutes for Research;

DR. RICHARD J. MURNANE,
Thompson Professor of Education
and Society, Harvard University;
DR. LEN M. NICHOLS, George
Mason University; DR. HAROLD
POLLACK, Helen Ross Professor of
Social Service Administration,
University of Chicago; DR.
MATTHEW RABIN, Edward G. and
Nancy S. Jordan Professor of
Economics, University of
California-Berkeley, 2001
Recipient of the John Bates Clark
Medal for the most influential
American economist under age 40;
DR. JAMES B. REBITZER, Professor
of Economics, Management, and
Public Policy, Boston University
School of Management; DR.
MICHAEL REICH, Professor of
Economics, University of
California at Berkeley; DR.
THOMAS RICE, Professor, UCLA
School of Public Health; DR.
MEREDITH ROSENTHAL, Department
of Health Policy and Management,
Harvard University, Harvard
School of Public Health;

DR. CHRISTOPHER RUHM, Professor of Public Policy and Economics, Department of Economics, University of Virginia; DR. JONATHAN SKINNER, Professor of Economics, Dartmouth College, and Professor of Community and Family Medicine, Dartmouth Medical School; DR. KATHERINE SWARTZ, Professor, Department of Health Policy and Management, Harvard School of Public Health; DR. KENNETH WARNER, Dean of the School of Public Health and Avedis Donabedian Distinguished University Professor of Public Health, University of Michigan; DR. PAUL N. VAN DE WATER, Senior Fellow, Center on Budget and Policy Priorities; DR. STEPHEN ZUCKERMAN, Senior Fellow, The Urban Institute; NATIONAL WOMEN'S LAW CENTER; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES; AMERICAN MEDICAL WOMEN'S ASSOCIATION; ASIAN & PACIFIC ISLANDER AMERICAN HEALTH FORUM; BLACK WOMEN'S HEALTH IMPERATIVE;

CHILDBIRTH CONNECTION; IBIS REPRODUCTIVE HEALTH; INSTITUTE OF SCIENCE AND HUMAN VALUES; MARYLAND WOMEN'S COALITION FOR HEALTH CARE REFORM; MENTAL HEALTH AMERICA; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; NATIONAL ASSOCIATION OF SOCIAL WORKERS; NATIONAL COALITION FOR LGBT HEALTH; NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL COUNCIL OF WOMEN'S ORGANIZATIONS; NATIONAL EDUCATION ASSOCIATION; NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH; OLDER WOMEN'S LEAGUE; PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; RAISING WOMEN'S VOICES; SARGENT SHRIVER NATIONAL CENTER ON POVERTY LAW; SOUTHWEST WOMEN'S LAW CENTER; WIDER OPPORTUNITIES FOR WOMEN; WOMEN'S LAW CENTER OF MARYLAND, INCORPORATED; WOMEN'S LAW PROJECT,

*Amici Supporting Appellees.*

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, Senior District Judge.
(6:10-cv-00015-nkm-mfu)

Argued: May 10, 2011

Decided: September 8, 2011

Before MOTZ, DAVIS, and WYNN, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Wynn concurred. Judge Wynn wrote a concurring opinion. Judge Davis wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Mathew D. Staver, LIBERTY COUNSEL, Orlando, Florida, for Appellants. Neal Kumar Katyal, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Anita L. Staver, LIBERTY COUNSEL, Orlando, Florida; Stephen M. Crampton, Mary E. McAlister, LIBERTY COUNSEL, Lynchburg, Virginia, for Appellants. Tony West, Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Alisa B. Klein, Samantha L. Chaifetz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Timothy J. Heaphy, United States Attorney, Roanoke, Virginia, for Appellees. Joel Spector, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Mountain States Legal Foundation, Amicus Supporting Appellants. Brian S. Koukoutchos, Mandeville, Louisiana; Charles J. Cooper, David H. Thompson, COOPER & KIRK, PLLC, Washington, D.C., for Revere America Foundation, Amicus Supporting Appellants. Rebecca Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, Richmond, Virginia; Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION, Washington, D.C.; Andrew D. Beck, Brigitte Amiri, AMERICAN CIVIL LIBERTIES UNION, New York, New York, for American Civil Liberties Union and American Civil Liberties Union of Virginia, Incorporated, Amici Supporting Appellees. Ian Millhiser, CENTER FOR

AMERICAN PROGRESS, Washington, D.C., for American Nurses Association, American Academy of Pediatrics, Incorporated, American Medical Student Association, Center for American Progress, d/b/a Doctors for America, National Hispanic Medical Association, and National Physicians Alliance, Amici Supporting Appellees. Professor Walter Dellinger, Washington, D.C.; Professor H. Jefferson Powell, GEORGE WASHINGTON UNIVERSITY LAW SCHOOL, Washington, D.C., for Senate Majority Leader Harry Reid, House Democratic Leader Nancy Pelosi, and Congressional Leaders and Leaders of Committees of Relevant Jurisdiction, Amici Supporting Appellees. Gillian E. Metzger, Trevor W. Morrison, New York, New York; Andrew J. Pincus, Charles A. Rothfeld, Paul W. Hughes, Michael B. Kimberly, MAYER BROWN LLP, Washington, D.C., for Constitutional Law Professors, Amici Supporting Appellees. Rochelle Bobroff, Simon Lazarus, NATIONAL SENIOR CITIZENS LAW CENTER, Washington, D.C., for American Association of People with Disabilities, The ARC of the United States, Breast Cancer Action, Families USA, Friends of Cancer Research, March of Dimes Foundation, Mental Health America, National Breast Cancer Coalition, National Organization for Rare Disorders, National Partnership for Women and Families, National Senior Citizens Law Center, National Women's Health Network, and The Ovarian Cancer National Alliance, Amici Supporting Appellees. Sheree R. Kanner, Catherine E. Stetson, Dominic F. Perella, Michael D. Kass, Sara A. Kraner, HOGAN LOVELLS US LLP, Washington, D.C.; Melinda Reid Hatton, Maureen D. Mudron, AMERICAN HOSPITAL ASSOCIATION, Washington, D.C.; Ivy Baer, Karen Fisher, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, Washington, D.C.; Jeffrey G. Micklos, FEDERATION OF AMERICAN HOSPITALS, Washington, D.C.; Larry S. Gage, President, NATIONAL ASSOCIATION OF PUBLIC HOSPITALS AND HEALTH SYSTEMS, Washington, D.C.; Lisa Gilden, Vice President, General Counsel/Compliance Officer, THE CATHOLIC HEALTH

ASSOCIATION OF THE UNITED STATES, Washington, D.C.; Lawrence A. McAndrews, President and Chief Executive Officer, NATIONAL ASSOCIATION OF CHILDREN'S HOSPITALS, Alexandria, Virginia, for American Hospital Association, Association of American Medical Colleges, Federation of American Hospitals, National Association of Public Hospitals and Health Systems, Catholic Health Association of the United States, and National Association of Children's Hospitals, Amici Supporting Appellees. Kristin Houser, Adam Berger, Rebecca J. Roe, William Rutzick, SCHROETER, GOLDMARK & BENDER, Seattle, Washington, for Christine O. Gregoire, Governor of Washington, Amicus Supporting Appellees. Richard L. Rosen, ARNOLD & PORTER LLP, Washington, D.C., for Economic Scholars, Amici Supporting Appellees. Marcia D. Greenberger, Emily J. Martin, Judith G. Waxman, Lisa Codispoti, NATIONAL WOMEN'S LAW CENTER; Melissa Hart, UNIVERSITY OF COLORADO LAW SCHOOL, Boulder, Colorado, for National Women's Law Center, American Association of University Women, Amerian Federation of State, County and Municipal Employees, American Medical Women's Association, Asian & Pacific Islander American Health Forum; Black Women's Health Imperative, Childbirth Connection, Ibis Reproductive Health, Institute of Science and Human Values, Maryland Women's Coalition for Health Care Reform, Mental Health America, National Asian Pacific American Women's Forum, National Association of Social Workers, National Coalition for LGBT Health, National Council of Jewish Women, National Council of Women's Organizations, National Education Association, National Latina Institute for Reproductive Health, Older Women's League, Physicians for Reproductive Choice and Health, Raising Women's Voices, Sargent Shriver National Center on Poverty Law, Southwest Women's Law Center, Wider Opportunities for Women, Women's Law Center of Maryland, Incorporated, and Women's Law Project, Amici Supporting Appellees.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Liberty University and certain individuals brought this suit to enjoin, as unconstitutional, enforcement of two provisions of the recently-enacted Patient Protection and Affordable Care Act. The challenged provisions amend the Internal Revenue Code by adding: (1) a "penalty" payable to the Secretary of the Treasury by an individual taxpayer who fails to maintain adequate health insurance coverage and (2) an "assessable payment" payable to the Secretary of the Treasury by a "large employer" if at least one of its employees receives a tax credit or government subsidy to offset payments for certain health-related expenses. The district court upheld these provisions, ruling that both withstood constitutional challenge. Because this suit constitutes a pre-enforcement action seeking to restrain the assessment of a tax, the Anti-Injunction Act strips us of jurisdiction. Accordingly, we must vacate the judgment of the district court and remand the case with instructions to dismiss for lack of jurisdiction.

I.

A.

On March 23, 2010, the President signed into law the Affordable Care Act, a comprehensive bill spanning 900 pages, which institutes numerous changes to the financing of health care in the United States. *See* Pub. L. No. 111-148. Liberty and some individuals (collectively "plaintiffs") challenge only two provisions of the Act.

1.

The first amends the Internal Revenue Code (sometimes "the Code") by adding § 5000A ("the individual mandate").[1]

---

[1]The Affordable Care Act itself refers to the provision as the "Requirement to maintain minimum essential coverage." Pub. L. No. 111-148,

*See id.*, § 1501(b). The individual mandate requires an "applicable individual" to "ensure" that beginning after 2013, the individual "is covered under minimum essential coverage." I.R.C. § 5000A(a). The individual mandate lists a number of health insurance programs that qualify for "minimum essential coverage": government- and employer-sponsored plans, individual market plans, and other health plans recognized as adequate. § 5000A(f)(1). If an individual "taxpayer" fails to obtain the required coverage, the "taxpayer" is subject to a "penalty." § 5000A(b)(1).

The Affordable Care Act uses the Internal Revenue Code's existing tax collection system to implement the penalty. Only a "taxpayer" is subject to the penalty, *id.*, and the Code defines a "taxpayer" as "any person subject to any internal revenue tax." *Id.* § 7701(a)(14). A taxpayer must include the penalty payment with his regularly-filed income tax return. § 5000A(b)(2). The taxpayer owes the penalty only if he fails to maintain minimum coverage for a continuous period of three months or longer. § 5000A(e)(4)(A). The individual mandate also makes a taxpayer liable for a penalty imposed on his "dependent," as defined in § 152 of the Code. § 5000A(b)(3)(A). Akin to the joint liability of spouses for income taxes, I.R.C. § 6013(d)(3), a taxpayer is also jointly liable for a spouse's penalty if filing a joint income tax return. § 5000A(b)(3)(B).

A taxpayer subject to the penalty owes the greater of: (1) a "flat dollar amount" equal to $95 for the taxable year beginning 2014, $325 for 2015, $695 for 2016, and $695 indexed to inflation for every year thereafter; or (2) a graduated percentage (1% in 2014, 2% in 2015, and 2.5% every year thereafter) of the amount by which the "taxpayer's household income," as defined by the Code, exceeds "gross income

---

§ 1501. Because plaintiffs refer to it as the individual mandate throughout their complaint and briefs, we often do so as well.

specified in" I.R.C. § 6012(a)(1) (the amount of income triggering the requirement to file a tax return). *See* § 5000A(c)(2), (3). But the penalty may not exceed the cost of the "national average premium for qualified health plans" of a certain level of coverage. § 5000A(c)(1).

Section 5000A(g)(1) authorizes the Secretary of the Treasury ("the Secretary") to assess and collect the penalty "in the same manner as an assessable penalty under subchapter B of chapter 68" of the Internal Revenue Code, which in turn contains penalties that the Secretary is to "assess[ ] and collect[ ] in the same manner as taxes." *Id.* § 6671(a). Accordingly, the Affordable Care Act provides the Secretary with all the civil enforcement tools of the Internal Revenue Code subject to only one express limitation: the Secretary may not seek collection of the penalty by "fil[ing] [a] notice of lien with respect to any property" or "levy[ing] on [a taxpayer's] property." § 5000A(g)(2)(B).

2.

The other provision of the Act challenged by plaintiffs amends the Internal Revenue Code by adding § 4980H (the "employer mandate"). Pub. L. No. 111-148, § 1513. That provision imposes an "assessable payment" on "any applicable large employer" if a health exchange notifies the employer that at least one "full-time employee" obtains an "applicable premium tax credit or cost-sharing reduction." I.R.C. § 4980H(a), (b). An "applicable premium tax credit or cost-sharing reduction" consists of either (1) a tax credit to assist a low-income individual with financing premiums for qualified health plans or (2) a government subsidy to help finance an individual's share of out-of-pocket health care costs, as provided by the Affordable Care Act. § 4980H(c)(3).

Section 4980H calculates the assessable payment differently depending on whether the employer offers adequate health insurance coverage to its employees. If the employer

fails to offer adequate coverage to its full-time employees, the "assessable payment" is calculated by multiplying $2,000 (increased yearly by the rate of inflation), by the number of total full-time employees, prorated over the number of months an employer is liable. § 4980H(a), (c)(1), (c)(5). If, however, the employer does offer adequate insurance coverage, the "assessable payment" is calculated by multiplying $3,000 by the number of employees receiving the "applicable premium tax credit or cost-sharing reduction," prorated on a monthly basis and subject to a cap. § 4980H(b)(1), (2).

A large employer must pay these assessments "upon notice and demand by the Secretary." § 4980H(d)(1). The Secretary has the authority to assess and collect the exaction in the "same manner as an assessable penalty" provided by subchapter B of Chapter 68 of the Code. *Id.*

## B.

On March 23, 2010, the day the President signed the Affordable Care Act into law, plaintiffs filed this action to enjoin the Secretary and other government officials from enforcing the Act. In their complaint, plaintiffs allege the following facts.

One of the individual plaintiffs, Michele G. Waddell, asserts that she "has made a personal choice not to purchase health insurance coverage" and does not want to do so in the future. Waddell maintains that she pays for needed health care services as she uses them. Another individual plaintiff, Joanne V. Merill, asserts that she too has "elected not to purchase health insurance coverage" and does not want to do so. Both Waddell and Merill contend that the individual mandate requires them "to either pay for health insurance coverage" or "face significant penalties."

They seek to enjoin the Secretary from assessing or collecting the exaction prescribed for failure to comply with the indi-

vidual mandate. Waddell and Merrill assert that, "as part of his oversight of the Internal Revenue Service," the Secretary has the "power to collect" the penalties "as part of an individual-['s] income tax return." They describe the individual mandate as imposing a "penalty in the form of a tax . . . on any tax-payer" who fails to maintain minimum essential coverage. They further allege that the "Taxing and Spending Clause . . . only grants Congress the power to impose taxes upon certain purchases, not to impose taxes upon citizens who choose not to purchase something such as health insurance." Similarly, Waddell and Merrill repeatedly assert that the individual mandate assesses "a direct tax that is not apportioned according to Census data or other population-based measurement," in violation of Congress's Taxing Power. Accordingly, they ask to be "free from improper taxation [that] is likely to cause significant financial hardships." They also contend that the individual mandate exceeds Congress's authority under the Commerce Clause of the Constitution.

Liberty, a private Christian university located in Lynchburg, Virginia, challenges the "employer mandate" as a tax that will impose "tax penalties" on it because it has employees who will likely receive a tax credit or cost-sharing reduction. Liberty alleges that these "significant penalties" will cause it to suffer "substantial financial hardship." According to Liberty, the employer mandate constitutes an "unapportioned direct tax upon employers in violation of" the Constitution, and "[i]mposition of the tax infringes upon Liberty University's rights to be free from improper taxation." Liberty also asserts that the employer mandate exceeds Congress's authority under the Commerce Clause.

For relief, plaintiffs ask for an injunction restraining all defendants, including the Secretary of the Treasury, from "acting in any manner to implement, enforce, or otherwise act under the authority" of the Affordable Care Act. They seek a declaration that the Act is unconstitutional and assert that they

have no "adequate remedy at law to correct" the continuing constitutional violation.

Before the district court, the Secretary moved to dismiss the case, contending *inter alia* that the federal tax Anti-Injunction Act (AIA), I.R.C. § 7421(a), barred the district court from reaching the merits because the challenged penalty is to "be assessed and collected" in the same manner as a tax and other penalties to which the AIA clearly applies. The court rejected this argument, holding that Congress did not intend to "convert the[se] penalties into taxes for purposes of the Anti-Injunction Act." The court reasoned that (1) Congress did not specifically extend the term "tax" in the AIA to include the challenged exactions; and (2) the exactions did not qualify as a "tax" for purposes of the AIA because they "function as regulatory penalties." After rejecting the AIA argument and the Secretary's other jurisdictional contentions, the district court concluded that the challenged exactions are "valid exercise[s] of federal power under the Commerce Clause" and dismissed the complaint for failure to state a claim upon which relief can be granted.

Plaintiffs then filed this appeal, asserting that the district court erred as a matter of law in upholding the Affordable Care Act. The Secretary argued to the contrary, specifically declining to attack the district court's "threshold determination[ ]" as to "the applicability of the Anti-Injunction Act." The Secretary did, however, maintain that Congress's Taxing Power under Article I, § 8, cl. 1 of the Constitution authorized the exactions imposed by the challenged mandates because those mandates "operate as taxes." Because the Secretary's contention as to the constitutionality of the mandates under the Taxing Power suggested that the AIA bar might apply to this suit, we ordered the parties to file supplemental briefs to address the applicability of the AIA. In these briefs, both the Secretary and plaintiffs contend that the AIA does not bar this action. We disagree.

We initially explain why we believe that the plain language of the AIA bars our consideration of this challenge. We then address the parties' contrary arguments: first those offered by the Secretary (and largely adopted by the dissent), then those advanced by plaintiffs.

II.

A.

We note at the outset the inescapable fact that federal courts are courts of limited jurisdiction. They possess "only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). Accordingly, a federal court has an "independent obligation" to investigate the limits of its subject-matter jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). This is so even when the parties "either overlook or elect not to press" the issue, *Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011), or attempt to consent to a court's jurisdiction, *see Sosna v. Iowa*, 419 U.S. 393, 398 (1975). Our obligation to examine our subject-matter jurisdiction is triggered whenever that jurisdiction is "fairly in doubt." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1945 (2009).

As part of the Internal Revenue Code, the AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." I.R.C. § 7421(a).[2] The parties concede, as they must, that, when applicable, the AIA divests federal courts of

---

[2]The Declaratory Judgment Act authorizes a federal court to issue a declaratory judgment "except with respect to Federal taxes." 28 U.S.C. § 2201(a). In *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.7 (1974), the Court held that "the federal tax exception to the Declaratory Judgment Act is at least as broad as the Anti-Injunction Act." Accordingly, our holding as to the Anti-Injunction Act applies equally to plaintiffs' request for declaratory relief.

subject-matter jurisdiction. The Supreme Court has explicitly so held. *See Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5 (1962).

By its terms the AIA bars suits seeking to *restrain* the assessment or collection of a tax. Thus, the AIA forbids only pre-enforcement actions brought *before* the Secretary of the Treasury or his delegee, the Internal Revenue Service (IRS), has assessed or collected an exaction. A taxpayer can always pay an assessment, seek a refund directly from the IRS, and then bring a refund action in federal court. *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4-5 (2008).

The parties recognize that plaintiffs here have brought a pre-enforcement action. Moreover, although Congress has provided numerous express exceptions to the AIA bar, *see* I.R.C. § 7421(a), the parties do not claim that any of these exceptions applies here. Resolution of the case at hand therefore turns on whether plaintiffs' suit seeks to restrain the assessment or collection of "any tax."

### B.

A "tax, in the general understanding of the term," is simply "an exaction for the support of the government." *United States v. Butler*, 297 U.S. 1, 61 (1936). An exaction qualifies as a tax even when the exaction raises "obviously negligible" revenue and furthers a revenue purpose "secondary" to the primary goal of regulation. *United States v. Sanchez*, 340 U.S. 42, 44 (1950); *see also Bob Jones*, 416 U.S. at 741 n.12. Thus, the term "tax" can describe a wide variety of exactions. *See Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 5 (1st Cir. 1992) (surveying cases that have regularly "applied the label 'tax'" to a "range of exactions," even those that "might not be commonly described as taxes").

The Supreme Court has concluded that the AIA uses the term "tax" in its broadest possible sense. This is so because

the AIA aims to ensure "prompt collection of . . . lawful revenue" by preventing taxpayers from inundating tax collectors with pre-enforcement lawsuits over "disputed sums." *Williams Packing*, 370 U.S. at 7-8. Thus, an exaction constitutes a "tax" for purposes of the AIA so long as the method prescribed for its assessment conforms to the process of tax enforcement. *See Snyder v. Marks*, 109 U.S. 189, 192 (1883) (defining a "tax" in the AIA as any exaction "in a condition [of being] collected as a tax"). Specifically, the AIA prohibits a pre-enforcement challenge to any "exaction [that] is made under color of their offices by revenue officers charged with the general authority to assess and collect the revenue." *Phillips v. CIR*, 283 U.S. 589, 596 (1931) (citing *Snyder*, 109 U.S. at 192); *see also Bob Jones*, 416 U.S. at 740 (applying the AIA bar when IRS action is authorized by "requirements of the [Internal Revenue Code]").

The Supreme Court has steadfastly adhered to this broad construction, notably in holding that the AIA bars pre-enforcement challenges to exactions that do *not* constitute "taxes" under the Constitution. *Compare Bailey v. George*, 259 U.S. 16 (1922) *with Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922). In *Bailey v. Drexel Furniture*, a *refund* action, the Court held unconstitutional as beyond Congress's Taxing Power a "so-called tax," finding it was in truth "a mere penalty, with the characteristics of regulation and punishment." 259 U.S. at 38. Yet the Court held the very same provision a "tax" for purposes of the AIA and so dismissed a pre-enforcement challenge to the exaction. *See Bailey v. George*, 259 U.S. at 20. In recent years, the Court has expressly affirmed these holdings, reiterating that the term "tax" in the AIA encompasses penalties that function as mere "regulatory measure[s] beyond the taxing power of Congress" and Article I of the Constitution. *Bob Jones*, 416 U.S. at 740.

The Court's broad interpretation of the AIA to bar interference with the assessment of any exaction imposed by the Code entirely accords with, and indeed seems to be mandated

by, other provisions of the Internal Revenue Code. The AIA does not use the term "tax" in a vacuum; rather, it protects from judicial interference the "*assessment . . . of any tax*." I.R.C. § 7421(a) (emphasis added). The Secretary's authority to make such an "assessment . . . of any tax" derives directly from another provision in the Code, which charges the Secretary with making "assessments of all taxes (*including* interest, additional amounts, additions to the tax, and assessable *penalties*) imposed by this title." § 6201(a) (emphases added); *see also* § 6202 ("assessment of any internal revenue tax" includes assessment of "penalties"). Thus, for purposes of the very assessment authority that the AIA protects, Congress made clear that "penalties" (as well as "interest, additional amounts, [and] additions to the tax") count as "taxes." Congress must have intended the term "tax" in the AIA to refer to this same broad range of exactions. *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context.").

In sum, the AIA forbids actions that seek to restrain the Secretary from exercising his statutory authority to assess exactions imposed by the Internal Revenue Code. *See, e.g.*, *Bob Jones*, 416 U.S. at 740 (holding AIA barred suit challenging IRS regulatory action when action was authorized by "requirements of the [Internal Revenue Code]"); *Mobile Republican Assembly v. United States*, 353 F.3d 1357, 1362 & n.5 (11th Cir. 2003) (holding AIA barred suits challenging "penalties imposed" for violating disclosure conditions of tax-exempt status); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 & n.12 (4th Cir. 1996) (holding AIA applied to "premiums" assessed and collected by the Secretary under color of the Internal Revenue Code); *cf. Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 558 n.9 (1976) (holding AIA did not bar challenge to "fees" because fees not "assessed under" the Internal Revenue Code). The exaction imposed for failure to comply with the individual mandate constitutes a "tax[ ]" as defined in the Code's assessment provisions. *See*

I.R.C. §§ 6201(a), 6202, 5000A(g)(1). For these reasons, the AIA bars this action.**³**

## III.

The Secretary's contrary contention primarily relies on the fact that the individual mandate labels the imposed exaction a "penalty," not a "tax." § 5000A(b). For the Secretary, the Sixth Circuit, *see Thomas More Law Center v. Obama*, ___ F.3d ___(6th Cir. 2011) [No. 10-2388], and now our friend in dissent, this "penalty" label renders the AIA inapplicable.

## A.

Indisputably, the AIA bars pre-enforcement challenges even when Congress has "exhibit[ed] its intent" that a challenged exaction function as a "penalty." *Compare Bailey v. Drexel*, 259 U.S. at 38, *with Bailey v. George*, 259 U.S. at 20. The term "penalty" therefore describes a category of exaction to which the Supreme Court has *already applied* the AIA.**⁴**

---

**³**Although both parties generally contend that the AIA does not bar this suit, neither offers any reason why the challenge to the *employer* mandate escapes the AIA bar. There is good reason for that. Because Congress placed the employer mandate in the Internal Revenue Code, triggering the Secretary's authority to assess and collect payment, all of the reasons set forth in the text as to why the AIA bars a pre-enforcement challenge to the individual mandate also apply to the employer mandate. We additionally note that Congress waived none of the Secretary's collection tools in imposing the employer mandate and labeled the exaction a "tax" in certain subsections. *See* § 4980H(b)(2), (c)(7), (d)(1). Accordingly, the AIA clearly bars Liberty's challenge to the employer mandate.

**⁴**This is not to elide the general distinction between taxes and penalties. We agree with the Sixth Circuit's general observation that there are "contexts" in which "the law treats 'taxes' and 'penalties' as mutually exclusive." *Thomas More*, ___ F.3d at ___ (slip op. at 11) (citing one bankruptcy and two constitutional cases). The question here is whether the AIA is one of these "contexts." Neither the Secretary nor the Sixth Circuit cites a single case suggesting that it is. The dissent relies on some bankruptcy cases in an attempt to import the distinction between a revenue-

Given this history, it seems inconceivable that Congress would intend to exclude an exaction from the AIA merely by describing it as a "penalty."

To be sure, Congress called the penalty at issue in the *Bailey* cases a "tax." That fact, however, only aids the Secretary if there is something talismanic about the *label* "penalty" that removes a challenged exaction from the scope of the AIA. The Secretary has cited no case even remotely supporting such a proposition. In fact, the Supreme Court has repeatedly instructed that congressional labels have little bearing on whether an exaction qualifies as a "tax" for statutory purposes. *See, e.g., Helwig v. United States*, 188 U.S. 605, 613 (1903) (holding "use of words" does not "change the nature and character of the enactment" in the context of the revenue laws);[5] *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 220 (1996) (requiring a court to look "behind the label placed on the exaction and rest[ ] its

---

raising "tax" and a regulatory "penalty" from that context. To accept the dissent's view would place us at odds with the Supreme Court's explicit holding, in the context *of the AIA*, that the distinction between "regulatory and revenue-raising" exactions has been "abandoned." *Bob Jones*, 416 U.S. at 741 & n.12.

[5]*Helwig* does not, as the dissent contends, support its view that an exaction's label controls. The Court in *Helwig* acknowledged that Congress may expressly classify an exaction as a "penalty or in the nature of one, *with reference to* the further action of the officers of the government, or *with reference to* the distribution of the moneys thus paid, or *with reference to* its effect upon the individual," and that "it is the duty of the court to be governed by such statutory direction." 188 U.S. at 613 (emphasis added). The Court then identified statute after statute illustrating the various ways in which Congress has historically directed a "duty," "additional duty," or "penalty" to be treated "with reference to" a specified governmental action. *Id.* at 614-19. Congress has provided no such direction "with reference to" the AIA, and *Helwig* makes clear that a mere label describing an exaction does *not* constitute such direction. *See id.* at 613 (explaining that "describing" an exaction "as 'a further sum' or 'an additional duty' will not work a statutory alteration of the nature of the imposition").

answer directly on the operation of the provision"); *United States v. Sotelo*, 436 U.S. 268, 275 (1978) (holding exaction's "penalty" label not dispositive, but its "essential character" controls, in determining whether exaction is a tax for bankruptcy purposes); *United States v. New York*, 315 U.S. 510, 515-16 (1942) (stressing that the term "tax" includes "any pecuniary burden laid upon individuals . . . for the purpose of supporting the government, *by whatever name* it may be called" (internal quotation omitted and emphasis added)).

Indeed, the Court has specifically found an exaction's label immaterial to the applicability of the AIA. *See Lipke*, 259 U.S. 557 (1922). In *Lipke*, the Supreme Court held that the "mere use of [a] word" to describe a challenged exaction was "not enough to show" whether a "tax was laid." *Id.* at 561. The Court concluded that one of the challenged exactions, although labeled a "tax," functioned in reality to "suppress crime" and so fell outside the AIA bar. *Id.* Moreover, notwithstanding the "penalty" and "special penalty" labels of the other challenged exactions, neither the majority nor Justice Brandeis in dissent gave these labels any import in determining the applicability of the AIA. *Compare id.* at 561-62 *with id.* at 563-65 (Brandeis, J., dissenting).

In light of this history, it is not surprising that no federal appellate court, except the Sixth Circuit in *Thomas More*, has ever held that the label affixed to an exaction controls, or is even relevant to, the applicability of the AIA.[6] Nonetheless, the Secretary and the dissent insist that the label of an exaction does control in determining if the AIA bar applies. We

---

[6]We certainly respect the views of the courts, trumpeted by the dissent, that have held the AIA inapplicable to suits like the one at hand. We note, however, that even unanimity among the lower courts is not necessarily predictive of the views of the Supreme Court. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 472 (2008) (Thomas, J., dissenting) (collecting cases where the Supreme Court has "reject[ed]" a "view uniformly held by the courts of appeals").

first address the Secretary's argument on this point and then the dissent's.

The Secretary acknowledges that when "passing on the *constitutionality* of a tax law," a court places no weight on the "precise form of descriptive words" attached to the challenged exaction. *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (internal quotation omitted) (emphasis added). But citing the twin *Bailey* cases as authority, the Secretary contends that the opposite rule must apply for purposes of the AIA, i.e. that for purposes of the AIA, the "precise form of descriptive words" given an exaction becomes dispositive.

The Secretary's reliance on the twin *Bailey* cases is mystifying. In fact, they provide no support for his position. In *Bailey v. Drexel Furniture*, 259 U.S. at 38, a refund action, the Court held that an exaction exceeded Congress's constitutional taxing authority, while on the same day, in *Bailey v. George*, 259 U.S. at 16, it dismissed a pre-enforcement challenge to the same exaction, characterizing it as a "taxing statute" for purposes of the AIA. When dismissing the pre-enforcement action, the Court did not state or suggest that it classified the challenged statute as a "taxing statute" because Congress labeled it as such. Nor does it seem plausible that the Court implicitly relied on that label, given that it had never before and has never since found an exaction's label controlling for statutory purposes. *See, e.g., Reorganized CF & I*, 518 U.S. at 220; *Sotelo*, 436 U.S. at 275; *Lipke*, 259 U.S. at 561; *Helwig*, 188 U.S. at 613. Rather, only one explanation of the twin *Bailey* cases coheres with the Court's precedents: the term "tax" in the AIA reaches any exaction assessed by the Secretary pursuant to his authority under the Internal Revenue Code—even one that constitutes a "penalty" for constitutional purposes.

The dissent's contention that the Supreme Court's reliance on the statutory label in *Bailey v. George* is so "obvious" that it required no explanation by the Court strikes us as unsound.

It seems doubtful that the Court departed from its normal practice of ignoring statutory labels without explaining why it was doing so. Instead, the more likely—and just as "straightforward"—explanation is that the Court described the exaction as a "taxing statute" because Congress had charged the tax collector with assessing the challenged exaction. *See Snyder*, 109 U.S. at 192.[7] Contrary to the dissent's belief, this holding did not require the Court to perform any elaborate "functional analysis," but rather to recognize simply that the challenged exaction formed part of the general revenue laws.

The dissent's related contention—that our interpretation of *Bailey v. George* brings that case into conflict with *Lipke*, in which the Supreme Court held that the AIA did not bar a certain pre-enforcement challenge—also misses the mark. In *Lipke*, the Court faced a challenge to the Secretary's assessment of an exaction imposed pursuant to the National Prohibition Act, a statute "primarily designed to define and suppress *crime*." 259 U.S. at 561 (emphasis added). Congress had enacted the statute to "prohibit intoxicating beverages" and authorized the tax collector to enforce a "tax" against persons who in violation of this criminal statute illegally manufactured or sold liquor. 41 Stat. 318. The National Prohibition Act, however, did not authorize the collector to make an

---

[7]The dissent argues that the statement in *Snyder*, 109 U.S. at 192-93, that the term "tax" in the AIA refers to those exactions "claimed by the proper public officers to be a tax," makes relevant the Secretary's present litigation position that the AIA does not bar this lawsuit. The most fundamental problem with this argument is that the Secretary still does "claim" that the challenged exaction is a "tax," albeit one authorized by the Constitution's Taxing Clause. *See* Appellee's Br. at 58. We cannot hold that the AIA does not apply to this "tax" merely because the Secretary has changed his stance on the AIA and now contends that the exaction is a tax *only* for constitutional purposes. To give the Secretary's lawyers such a veto over the AIA bar would abdicate our "independent obligation" to assure ourselves of our own jurisdiction. *Arbaugh*, 546 U.S. at 514. Moreover, Congress called the exaction in the employer mandate a "tax." *See* 26 U.S.C. § 4980H(b)(2), (c)(7), (d)(1). The argument is for this reason, too, fatally flawed.

assessment under his general revenue authority; rather, it converted him into a federal prosecutor. Specifically, it (1) conferred upon the collector an array of prosecutorial powers, subject to the control of the Attorney General, and (2) predicated the enforcement of the challenged tax on proof of *criminal* guilt. 41 Stat. 305, 317-18. The *Lipke* Court held that the AIA did not bar a pre-enforcement challenge to this exaction because "guarantees of due process" required pre-enforcement review of "penalties for crime." 262 U.S. at 562.

*Lipke* thus casts no doubt on our conclusion that the term "tax" in the AIA reaches any exaction imposed by the Code *and* assessed by the tax collector pursuant to his general revenue authority. *Lipke* held only that when Congress converts the tax assessment process into a vehicle for *criminal* prosecution, the Due Process Clause prohibits courts from applying the AIA. *See United States v. One Ford Coupe Auto.*, 272 U.S. 321, 329 (1926) (characterizing *Lipke* as "merely" a "due process" case); *see also Bob Jones*, 416 U.S. at 743 (describing *Lipke* as permitting pre-enforcement review of "tax statutes" that function as "adjuncts to the criminal law"); *Lynn v. West*, 134 F.3d 582, 594-95 (4th Cir. 1998) (citing *Lipke* for proposition that courts possess jurisdiction to enjoin "a tax that is in reality a criminal penalty"). Of course, the individual mandate imposes no such *criminal* penalty, and thus presents no constitutional impediment to applying the AIA.

In sum, the Supreme Court has itself emphasized that *Lipke* creates only a narrow constitutional limitation, not applicable here, on the holding of the twin *Bailey* cases that the AIA reaches a *broader* range of exactions than does the term "tax" in the Constitution. *See Bob Jones*, 416 U.S. at 741 n.12 (citing *Lipke* and noting, in the context of the AIA, that the Court has since "abandoned" any distinction between "revenue-raising" taxes and "regulatory" penalties). Yet the theory propounded by the Secretary and the dissent—that a label transforms a constitutional "tax" into a "penalty" for AIA purposes — would yield an AIA that reaches *fewer* exactions than does

the Constitution. As former Commissioners of the IRS noted in criticizing this argument, this is the "opposite of what the Supreme Court held" in the twin *Bailey* cases. *See* Brief for Mortimer Caplin & Sheldon Cohen as Amici Curiae Supporting Appellees at 24, *Seven-Sky v. Holder*, No. 11-5047 (D.C. Cir. July 1, 2011). The Secretary all but acknowledges this fact, admitting that the *Bailey* cases show only the "converse" of the position that he now propounds. We cannot upend the Supreme Court's settled framework for determining if an exaction is a tax for statutory purposes on the basis of a theory for which the Secretary musters only cases that hold the "converse."

## B.

Perhaps in recognition of the dearth of case law supporting their argument, the Secretary and the dissent rely heavily on an inference they draw from the structure of the Internal Revenue Code to support their position.

Section 6665(a)(2) provides the starting point for this inference; it states that "any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the . . . penalties provided by *this chapter*," i.e. Chapter 68. *See* § 6665(a)(2)(emphasis added); *see also* § 6671(a) (redundantly stating the same for "penalties and liabilities provided by" subchapter B of Chapter 68). According to the Secretary and the dissent, § 6665(a)(2) necessarily implies that any "penalty" outside of Chapter 68 does not qualify as a "tax" for purposes of the Code. Because Congress codified the individual mandate in Chapter 48 of the Code (entitled "Miscellaneous Excise Taxes") rather than Chapter 68 (entitled "Assessable Penalties"), the Secretary and the dissent urge us to infer that Congress did not intend the individual mandate to constitute a "tax" for purposes of the AIA.

The fundamental difficulty with this argument is that § 6665(a)(2) merely clarifies that the term "tax" encompasses

the penalties contained in Chapter 68; it does not limit the term "tax" to *only* these penalties. Nor can we imply such an limitation, for courts must not "read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). There is no evidence that in enacting the clarifying language of § 6665(a)(2), Congress intended to exclude a "penalty" codified outside of Chapter 68 from also qualifying as a "tax." *See United States v. Sischo*, 262 U.S. 165, 169 (1923) (holding no inference can be made to imply an exclusion when Congress enacts an "extension," rather than "restriction," of a term).

Furthermore, the suggestion that we infer from § 6665(a)(2) a categorical exclusion from the term "tax" of all non-Chapter 68 penalties violates Congress's express instructions. In § 7806(b) of the Code, Congress has forbidden courts from deriving any "inference" or "implication" from the "location or grouping of any particular section or provision or portion of this title." I.R.C. § 7806(b). The argument of the Secretary and the dissent demands that we draw precisely such a forbidden "inference," for under their theory, the character of a penalty turns entirely on the Chapter in which it is "locat[ed]."**[8]**

Moreover, the Secretary's newly-minted position that Congress has implicitly excluded any "penalty" codified outside of Chapter 68 from qualifying as a "tax" contradicts his previous interpretation of the AIA. In *Mobile Republican Assem-*

---

**[8]**Contrary to the dissent's contention, this conclusion does not "reject the legal force" of § 6665(a)(2). When Congress expressly directs that the location of a provision matters, as it has in § 6665(a)(2), then a court need not *infer* anything and Congress's direction controls. But to adopt the position of the Secretary and the dissent, a court would have to *infer* that an exaction is not to be treated as a tax from the exaction's place in the Code (here Chapter 48 rather than Chapter 68). It is this *inference* that the Code forbids.

*bly*, 353 F.3d 1357, the Secretary defended against a pre-enforcement challenge to an exaction imposed by I.R.C. § 527(j), for failure to comply with the conditions attached to tax-exempt status. The district court held the AIA inapplicable for precisely the reasons that the Secretary now espouses, i.e. because Congress had labeled the exaction a "penalty" and codified it outside of Chapter 68. *See National Federation of Republican Assemblies v. United States*, 148 F. Supp. 2d 1273, 1280 (S.D. Ala. 2001). But the Secretary appealed, insisting that the AIA *did* apply because the challenged "penalty" was to be "assessed and collected in the same manner as taxes." Br. of Appellant at 32, *Mobile Republican Assembly*, 353 F.3d 1357 (Feb. 18, 2003) (No. 02-16283), 2003 WL 23469121. The Eleventh Circuit agreed and dismissed the suit because the exaction was based "squarely upon the explicit language of the Internal Revenue Code" and "form[ed] part of the overall tax subsidy scheme." 353 F.3d at 1362 n.5.

The Secretary fails to explain his change in position or even refer to the Eleventh Circuit's holding that the AIA applies to "penalties" codified outside of Chapter 68. Instead, the Secretary's argument boils down to his intuition, accepted by the Sixth Circuit and the dissent, that "Congress said one thing in sections 6665(a)(2) and 6671(a), and something else in section 5000A [the individual mandate], and we should respect the difference." *Thomas More*, ___ F.3d at ___ [No. 10-2388, slip op. at 12].

But we can easily "respect the difference" in congressional wording without holding plaintiffs' challenge exempt from the AIA bar. The legislative history of § 6665(a)(2) makes clear that Congress inserted that provision in the course of reorganizing and codifying the revenue laws in 1954, and did so merely to declare explicitly what had been implicit—that the term "tax" for purposes of the Code also refers to "penalties" imposed by the Code. *See* H.R. Rep. No. 83-1337, at A420 (1954) (noting that predecessor to § 6665(a)(2) "conforms to the rules under existing law" and "contain[s] no

material changes to existing law"); S. Rep. No. 83-1622, at 595-96 (1954) (same).[9] Given this history, we cannot interpret § 6665(a)(2) as working any substantive change to the Code; rather, it simply "mak[es] explicit what" was already "implied" by the Code. *Sischo*, 262 U.S. at 169; *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 317-18 (1985). That Congress did not repeat this clarifying language when it enacted the individual mandate, which is not part of any reorganization or recodification of the Code, demonstrates nothing.[10]

Rather, Congress well knew that the Code had for decades expressly provided that for purposes of the Secretary's assessment power, the term "tax" "includ[es] . . . penalties." I.R.C. § 6201(a). Specific direction that the term "tax" in the AIA encompass the individual mandate "penalty" was therefore unnecessary. *Cf. Bob Jones*, 416 U.S. at 741-42 (noting that Congress intended AIA to adapt to evolving "complexity of federal tax system"). Put another way, § 6201 specifically provides the Secretary with authority to make "assessments of all taxes (including . . . penalties)," and the AIA specifically bars judicial interference with the Secretary's power to make "assessment . . . of any tax." Given that Congress has not provided to the contrary, these two provisions taken together

---

[9]Congress originally inserted the text of § 6665 as § 6659 of the 1954 Code, *see* Internal Revenue Code of 1954, Pub. L. No. 83-289, § 6659(a)(2), 68A Stat. 1, 827 (1954), but relocated it to § 6665 in 1989 without making any changes to it, *see* Omnibus Reconciliation Act of 1989, Pub. L. No. 101-239, tit. VII, § 7721(a), (c)(2), 103 Stat. 2106, 2399 (1989) (codified at I.R.C. § 6665(a)).

[10]This does not mean that § 6665(a)(2), which includes Chapter 68 penalties within the term "tax" *throughout* the Code, serves no purpose. For example, § 6665(a)(2) may well be necessary to authorize a taxpayer to pursue a civil suit for the illegal "collection of Federal tax" against a collector who intentionally misinterprets the Code in collecting a Chapter 68 "penalty." *See* I.R.C. § 7433(a); *cf. Sylvester v. United States*, 978 F. Supp. 1186, 1189 (E.D. Wis. 1997); *Le Premier Processors, Inc. v. United States*, 775 F. Supp. 897, 902 n.6 (E.D. La. 1990).

mandate the conclusion that the AIA bars this suit seeking to "restrain" an "assessment" of the exaction challenged here, regardless of the exaction's label.

The Secretary's contrary "label" argument not only fails to persuade, it also requires a strained interpretation of the Code. The Secretary urges us to take the view that Congress intended the individual mandate to constitute the *only* exaction imposed by the lengthy Internal Revenue Code that does not qualify as a "tax."[11] The consequences of this counterintuitive argument extend well beyond the AIA. For example, accepting the Secretary's contention that the label "penalty" exempts the individual mandate from provisions applicable to "taxes" would inexplicably eliminate a host of procedural safeguards against abusive tax collection. *See, e.g.*, §§ 7217(a) (prohibiting executive branch officials from requesting IRS officials to "conduct or terminate an audit . . . with respect to the tax liability" of any particular taxpayer), 7433(a) (providing civil damages for unauthorized "collection of Federal tax"), 7435 (providing civil damages for unauthorized enticement of disclosure concerning the "collection of any tax"). We will not presume that Congress intended such an anomalous result, and we certainly cannot infer this intent on the basis of a mere label.

## C.

The Secretary's remaining contentions, some of which are

---

[11]The Secretary yet again employs faulty reasoning to reach this remarkable conclusion. He contends that three other exactions labeled as penalties and codified *outside* Chapter 68 — I.R.C. §§ 5114(c)(3), 5684(b), 5761(e) — constitute "taxes" for purposes of the AIA because they shall be "assessed, collected, and paid in the same manner as taxes, as provided in section 6665(a)." But the only meaningful difference between these provisions and the individual mandate is the addition of the phrase, "as provided in section 6665(a)," which refers only to the previous clause and does not incorporate the separate, unreferenced parts of § 6665(a).

adopted by the dissent, are brief and unsupported by any statute or case law. All are policy arguments, relying on the Secretary's view of what the 2010 Congress, in enacting the individual mandate, assertedly "would regard" as "mak[ing] sense," or "would not have wanted," or as the dissent would have it, what the 2010 Congress "intended." According to the Secretary and the dissent, these policy concerns demonstrate that the 2010 Congress could not have wanted the AIA to bar pre-enforcement challenges to the individual mandate.

The most fundamental difficulty with this contention is its focus on the "intent" of the 2010 Congress in enacting the individual mandate. Our task is not to divine the intent of the 2010 Congress but simply to determine whether the term "tax" in the AIA encompasses the exaction challenged here. To resolve this question, we must look to the text of the AIA and the intent *of the Congresses that enacted and re-enacted that statute*, just as the Supreme Court has done in its AIA cases. *See, e.g.*, *South Carolina v. Regan*, 465 U.S. 367, 375 (1984); *Bob Jones*, 416 U.S. at 741-42; *Snyder*, 109 U.S. at 191.

Once we conclude that the term "tax" in the AIA does encompass a challenged exaction, we can go no further. For the terms of the AIA declare that courts, save for specific statutory exceptions, not applicable here, may entertain "*no* suit for the purpose of restraining the assessment or collection of *any* tax." 26 U.S.C. § 7421(a) (emphasis added). This expansive language leaves no room for a court to carve out exceptions based on the policy ramifications of a particular pre-enforcement challenge. The Supreme Court said as much in *Bob Jones*, repudiating its old cases that had embraced a "departure from the literal reading of the Act" based on "exceptional circumstances." 416 U.S. at 743. In doing so, the Court instructed that courts must give the AIA "literal force, without regard to the . . . nature of the pre-enforcement challenge." *Id.* at 742.

Of course, the 2010 Congress could have exempted the individual mandate from the AIA. But to date it has not provided for such an exemption, and surely we cannot hold it has *implicitly* done so. To infer an intent on the part of the 2010 Congress to exempt this pre-enforcement challenge from the otherwise-applicable AIA bar would be tantamount to finding an implicit repeal of that bar; such an approach would violate the "cardinal rule" that "repeals by implication are not favored." *TVA v. Hill*, 437 U.S. 153, 189 (1978) (applying the implicit "repeal" doctrine to the TVA's argument that "the Act cannot reasonably be interpreted as applying to [the challenged] federal project"); *see also United States v. United Continental Tuna Corp.*, 425 U.S. 170, 169 (1976) (holding that courts must be "hesitant to infer that Congress," in enacting a later statute, "intended to authorize evasion of a [prior] statute"). Given that the terms of the AIA encompass the exaction imposed by § 5000A(b), the "only permissible justification" for exempting that exaction is if the individual mandate is "irreconcilable" with the AIA. *Hill*, 437 U.S. at 189. Obviously, it is not.

Accordingly, it is simply irrelevant what the 2010 Congress would have thought about the AIA; all that matters is whether the 2010 Congress imposed a tax. If it did, then the AIA bars pre-enforcement challenges to that tax. After all, were we to embrace the argument pressed by the Secretary and the dissent that the AIA applies only when a subsequent Congress has exhibited an intent for it to apply, we would impermissibly render the AIA little more than a non-binding suggestion to future Congresses, devoid of independent legal force. *See Tuna Corp.*, 425 U.S. at 169 (holding that courts must require explicit "expression by Congress" that it intends the "compromise or abandonment of previously articulated policies"). The Supreme Court has rejected this very view, holding that the AIA establishes a nearly irrebuttable presumption that no tax may be challenged in any pre-enforcement action. *See Bob Jones*, 416 U.S. at 743-46.

Even taken on their own terms, however, the proffered policy arguments fail. Neither the Secretary nor the dissent has identified any persuasive evidence that the 2010 Congress in fact intended to permit pre-enforcement challenges to the individual mandate.[12] The best evidence of what Congress intended, of course, is the legislation it actually enacted. *See Carcieri v. Salazar*, 129 S. Ct. 1058, 1066-67 (2009). Congress could have enacted an exemption from the AIA bar; it did so in other instances. *See, e.g.*, I.R.C. §§ 4961(c)(1) (second-tier tax exempt from AIA), 6703(c)(1) (penalty exempt from AIA upon satisfying statutory conditions), 7421(a) (listing several exactions and procedures exempt

---

[12]The Secretary offers only congressional floor statements as evidence of this supposed congressional intent. In those statements, two Senators contemplated a potential onslaught of challenges to the individual mandate but, as the Secretary puts it, "never suggested that the only way for an individual to obtain review would be . . . [through] a refund action." The Supreme Court has long held that such statements are of little assistance in ascertaining congressional intent. *See, e.g.*, *Grove City College v. Bell*, 465 U.S 555, 567 (1984). Moreover, the floor statements relied on here are irrelevant, because at most they signal an acknowledgment of potential lawsuits, not an endorsement of challenges seeking pre-enforcement injunctive relief.

The dissent goes even a step further than the Secretary, inferring an AIA exception because drafts of what became the Affordable Care Act had previously called the challenged exaction a "tax." The Supreme Court has warned against such an approach, cautioning courts not to read much into Congress's unexplained decision to change wording in a final bill. *See Trailmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947) (noting that the "interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers"). Moreover, the dissent errs in suggesting that our holding "ignores" this wording change; rather, we simply hold that change irrelevant *to the AIA bar*. Congress's decision to call the challenged exaction a "penalty" may affect its treatment under sections of the Code that expressly distinguish "taxes" from "penalties," e.g. those pertaining to the timing of interest accrual. *See Latterman v. United States*, 872 F.2d 564, 569-70 (3d Cir. 1989). Or Congress's wording change may have simply carried political benefits. *See Florida v. HHS*, 716 F. Supp. 2d 1120, 1142-43 (N.D. Fla. 2010). No evidence, however, indicates that the change was intended to exempt the individual mandate from the AIA.

from AIA). But Congress has provided so such exemption here. Alternatively, Congress could have crafted a specific route to pre-enforcement judicial review. *See Sigmon Coal Co. v. Apfel,* 226 F.3d 291, 301 (4th Cir. 2000); *see also Clinton v. City of New York*, 524 U.S. 417, 428-29 (1998). Again, it did not do so here. Thus, Congress knows how to exempt a specific exaction from the AIA bar, and that it did not do so here strongly undermines the contention that Congress intended such an exemption.

Nor do the Secretary's policy arguments, which the dissent embraces, demonstrate that the AIA should not apply here. The Secretary contends that "it makes sense that Congress would regard it as unnecessary to apply the AIA bar" to the individual mandate because, in the mandate, Congress prohibited the Secretary from using his "principal tools" to "collect unpaid taxes." Maybe so. But the Secretary's argument ignores the fact that the AIA bars challenges seeking to restrain the "assessment *or* collection of any tax." I.R.C. § 7421(a) (emphasis added). Congress's intent to waive *some* of the Secretary's *collection* tools does not in any way evidence that it would want to invite pre-enforcement challenges to the Secretary's remaining collection powers or all of his assessment authority. And the Supreme Court has left no doubt that restraining even "one method of collection" triggers the AIA's prohibition on injunctive suits. *United States v. Am. Friends Serv. Comm.*, 419 U.S. 7, 10 (1974).

Alternatively, the Secretary argues that because the individual mandate "is 'integral' to the [Affordable Care Act's] guaranteed-issue and community-rating provisions" and has a "delayed . . . effective date," Congress would have "wanted" early resolution of challenges to it and "did not intend the AIA to prohibit pre-enforcement challenges." This argument ignores that any holding that the AIA bar does not apply to the individual mandate might have serious long-term consequences for the Secretary's revenue collection. The Congressional Budget Office projects that 34 million people will

remain uninsured in 2014 and thus potentially subject to the challenged "penalty." Letter from Douglas W. Elmendorf, CBO Director, to Hon. Harry Reid, Senate Majority Leader, at table 4 (Dec. 19, 2009). To exempt the individual mandate from the AIA would invite millions of taxpayers—each and every year—to refuse to pay the § 5000A(b) exaction and instead preemptively challenge the IRS's assessment.

Moreover, some of those taxpayers will undoubtedly possess a host of non-constitutional, individual grounds upon which to challenge the assessment of the § 5000A(b) exaction. As former IRS Commissioners warned in a recent brief, allowing these suits would severely hamper IRS collection efforts. *See* Brief for Mortimer Caplin & Sheldon Cohen as Amici Curiae Supporting Appellees at 12-15, *Seven-Sky v. Holder*, No. 11-5047 (D.C. Cir. July 1, 2011). This would threaten to interrupt the IRS's collection of $4 billion annually from the challenged exaction. *See* Letter from Elmendorf to Reid at table 4. Moreover, those challenges could impede the collection of other income taxes by preemptively resolving—in litigation over the exaction imposed by § 5000A(b)—issues basic to all tax collection, such as a taxpayer's adjusted gross income.[13] *See* I.R.C. § 5000A(c)(2)(B); *C.I.R. v. Sunnen*, 333 U.S. 591, 597-98 (1948) (issue preclusion "applicable in the federal income tax field").

Thus, while the Secretary and the dissent may be correct that we could resolve this one lawsuit with few adverse revenue consequences, the holding necessary to reach the merits here could, in the long-run, wreak havoc on the Secretary's ability to collect revenue. If Congress is persuaded by the

---

[13]Other issues raised by the individual mandate that are common to many taxes include certain deductions from income taxes (§ 5000A(c)(4)(C)(i)), child dependency determinations (§ 5000A(b)(3)(A)), joint liability for spouses (§ 5000A(b)(3)(B)), the income level triggering a taxpayer's duty to file a return (§ 5000A(c)(2)(B)), and family size for deduction purposes (§ 5000A(c)(4)(A)).

Secretary's present litigation position, it can craft a specific AIA exception for constitutional challenges to the individual mandate. *See* I.R.C. § 7428(a) (inserting, after *Bob Jones*, an exemption for the exact sort of pre-enforcement challenge the *Bob Jones* Court had held barred by the AIA). Until it does so, however, we are bound by its directive that we entertain "no suit" restraining the assessment of "any tax." § 7421(a).

IV.

Having dispensed with the Secretary's arguments, we turn finally to the arguments pressed by plaintiffs.

A.

Plaintiffs initially contend that the AIA bar does not apply because this "case does not seek to restrain the assessment or collection of a tax." The plaintiff university in *Bob Jones* tendered precisely the same initial argument. Its "first" contention was that the AIA did not apply because its suit was not brought "for the purpose of restraining the assessment or collection of any tax." 416 U.S. at 738. The Supreme Court held that the university's complaint "belie[d] [this] notion." *Id.* So it is here. For, in their complaint, plaintiffs characterize the individual mandate as a "tax" and ask for a judicial invalidation of this "tax[ ] upon citizens who choose not to purchase something such as health insurance." They assert that the individual mandate provision, although labeled a "penalty," is a "tax" not apportioned as required by Article I of the Constitution, and a "tax" beyond the scope of congressional power under the Sixteenth Amendment of the Constitution. Thus, as in *Bob Jones*, plaintiffs' complaint belies their initial contention.[14]

---

[14]Moreover, *Bob Jones* forecloses an argument that the AIA allows a challenge to the requirement that an individual maintain insurance, i.e. § 5000A(a), separate from a challenge to the penalty for noncompliance with this requirement, i.e. § 5000A(b). Some district courts have accepted

Plaintiffs' remaining contention as to why the AIA does not bar their challenge to the individual mandate is that it imposes an unconstitutional regulatory penalty "not designed to raise revenue," which assertedly violates the Commerce Clause, the Taxing and Spending Clause, and unspecified "other constitutional rights." The problem with this argument is that a claim that an exaction is an unconstitutional regulatory penalty does not insulate a challenge to it from the AIA bar. Again, in *Bob Jones*, the Court confronted and rejected precisely this argument.

Like plaintiffs here, the university in *Bob Jones* asserted that the IRS's "threatened action" would "violate [its constitutional] rights." *Id.* at 736 (asserting various First and Fourteenth Amendment rights). In fact, in its brief to the Supreme Court, the university made an argument identical to that here. The university maintained that "what the government would have the University do . . . involves not revenue but rather unconstitutional compulsion," Brief for Petitioner at 28, *Bob Jones Univ. v. Simon*, 416 U.S. 725 (1973) (No. 72-1470), 1973 WL 172321. This mirrors the plaintiffs' contention here that the mandate is "not designed to raise revenue" but instead to unconstitutionally "compel[ ]" specific behavior. Just as the *Bob Jones* Court held the university's argument foreclosed by the twin *Bailey* cases, *see* 416 U.S. at 740-41, we must hold plaintiffs' identical argument foreclosed by those cases.

---

this argument. *See, e.g.*, *Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*, 764 F. Supp. 2d 684, 695 (M.D. Pa. 2011); *Thomas More Law Center v. Obama*, 720 F. Supp. 2d 882, 891 (E.D. Mich. 2010). But invalidation of the individual mandate would necessarily preclude the Secretary from exercising his statutory authority to assess the accompanying penalty. Moreover, in *Bob Jones*, the Court held that the AIA barred a challenge to the IRS's interpretation of I.R.C. § 501(c)(3), even though that provision itself did not impose any tax; only when coupled with § 501(a) (making a 501(c)(3) organization exempt from income taxes) did tax consequences result. 416 U.S. at 738.

For in *Bob Jones*, the Supreme Court not only reaffirmed the twin *Bailey* cases as setting forth the proper course by which a taxpayer could challenge an exaction but also explained that it had "abandoned . . . distinctions" between "regulatory and revenue-raising taxes." *Id.* at 741 n.12. The Court held that the AIA bar applied even to an exaction implementing a social policy unless a plaintiff could demonstrate that the IRS "has no legal basis" in the Code for assessing the exaction or seeks an objective "unrelated to the protection of the revenues." *Id.* at 740. Plaintiffs cannot and do not make any contention that the IRS has "no legal basis" in the Code for assessing the penalty in § 5000A or that this exaction is "unrelated to the protection of the revenues."

In sum, we find plaintiffs' argument that the AIA does not apply here wholly unpersuasive.

B.

Perhaps recognizing the weakness of their argument as to the inapplicability of the AIA, plaintiffs principally contend that a narrow judicially-created exception to the AIA permits pursuit of their action seeking a pre-enforcement injunction against enforcement of the individual mandate.

That exception allows a plaintiff to escape the AIA bar if he demonstrates that (1) equity jurisdiction otherwise exists, i.e. irreparable injury results if no injunction issues, *and* that (2) "it is clear that under no circumstances could the [Secretary] ultimately prevail." *Williams Packing*, 370 U.S. at 7.[15] When making the latter determination, a court must take "the most liberal view of the law and the facts" in favor of the Sec-

---

[15] The Court has carved out one other exception to the AIA for "aggrieved parties for whom [Congress] has not provided an alternative remedy." *See Regan*, 465 U.S. at 378. That exception clearly does not assist plaintiffs because, as the Secretary concedes, they may challenge the individual mandate in a refund action. *See Bob Jones*, 416 U.S. at 746.

retary. *Id.* It is difficult to see how any irreparable injury justifies the injunctive relief requested here. But even assuming equity jurisdiction does exist here, plaintiffs cannot meet the stringent standard of proving with certainty that the Secretary has "no chance of success on the merits." *Bob Jones*, 416 U.S. at 745.

In rejecting the university's contention that it would prevail on the merits, the *Bob Jones* Court explained that the sole case in which a plaintiff had met this exacting standard was *Miller v. Standard Nut Margarine Co.*, 284 U.S. 498 (1932). That case is a far cry from the case at hand. In *Standard Nut*, a tax collector attempted to assess a tax that federal courts had already held in a proper *post-enforcement* action did not apply to the plaintiff's product. *Id.* at 510. By contrast, to date, no court has even considered the validity of the individual mandate in a *post-enforcement* action, let alone held it invalid in such a proceeding. Moreover, in pre-enforcement actions, the courts of appeals have divided as to the constitutionality of the individual mandate. *Compare Florida v. HHS*, ___ F.3d ___ (11th Cir. 2011) (invalidating mandate) *with Thomas More*, ___ F.3d ___ (upholding mandate). Given this history and the presumption of constitutionality a federal court must afford every congressional enactment, *see United States v. Morrison*, 529 U.S. 598, 607 (2000), we can hardly hold that the Secretary has "no chance of success on the merits." *Bob Jones*, 416 U.S. at 745.

## V.

In closing, we recognize "that Congress has imposed" a potentially "harsh regime" on some taxpayers. *Id.* at 749. However, as in *Bob Jones*, the question of whether these concerns "merit consideration" is a matter for Congress to weigh. *Id.* at 750. Unless and until Congress tells us otherwise, we must respect the AIA's bar to the "intrusion of the injunctive power of the courts into the administration of the revenue." *Regan*, 465 U.S. at 388 (O'Connor, J., concurring).

For all these reasons, we vacate the judgment of the district court and remand the case to that court to dismiss for lack of subject-matter jurisdiction.

*VACATED AND REMANDED*

WYNN, Circuit Judge, concurring:

I.

I concur in Judge Motz's fine opinion holding that the Anti-Injunction Act applies to this case. I therefore agree that it should be remanded to the district court for dismissal.

I note that my distinguished colleague, after vigorously dissenting from the majority's holding that the AIA applies, chose to exercise his prerogative to address the merits.[1] While I think that his position on the Commerce Clause is persuasive, were I to reach the merits, I would uphold the constitutionality of the Affordable Care Act on the basis that Congress had the authority to enact the individual and employer mandates under its plenary taxing power.[2] However,

---

[1]The majority opinion vacates the district court's decision and remands plaintiffs' lawsuit for dismissal. Judge Davis dissents from the majority's dismissal of plaintiffs' suit on AIA grounds; nonetheless, on the merits, he, too, would dismiss plaintiffs' lawsuit.

[2]Justices and judges have previously spoken on the merits after stating that the court lacked jurisdiction; my approach today is therefore nothing new. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1777 (2010) (Ginsburg, J., dissenting) ("The Court errs in addressing an issue not ripe for judicial review . . . . I would dismiss the petition as improvidently granted. Were I to reach the merits, I would adhere to the strict limitations the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., places on judicial review of arbitral awards. § 10. Accordingly, I would affirm the judgment of the Second Circuit, which rejected petitioners' plea for vacation of the arbitrators' decision."); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 23 (1987) (Marshall, J., concurring in the judgment) ("Were I to reach the merits I would reverse for the reasons stated in the concur-

my conclusion that the mandates are (constitutional) taxes inevitably leads back to the AIA's bar to this case.

## II.

### A.

Plaintiffs contend that "[t]he Taxing and Spending or General Welfare Clause does not vest Congress with the authority to enact the mandates." Opening Brief of Appellants Liberty University, Michele G. Waddell and Joanne J. Merrill at 40, *Liberty Univ. v. Geithner*, No. 10-2347. I disagree. The individual and employer mandate provisions are independently authorized by Congress's constitutional power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

"A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the government." *United States v. Butler*, 297 U.S. 1, 61 (1936). Stated differently, a tax is a "pecuniary burden laid upon individuals or property for the purpose of supporting the government." *United States v. New York*, 315 U.S. 510, 515-16 (1942) (quoting *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906)).

---

ring opinions of Justices Brennan and Stevens, in which I join. But I can find no basis for the District Court's unwarranted assumption of jurisdiction over the subject matter of this lawsuit, and upon that ground alone I would reverse the decision below."); *Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 900 (9th Cir. 2011) (Kozinski, J., dissenting) (determining that court lacked jurisdiction but also analyzing claims on their merits); *Patel v. Holder*, 563 F.3d 565, 569 (7th Cir. 2009) (majority opinion doing same); *cf. Helvering v. Davis*, 301 U.S. 619, 639-40 (1937) (noting the belief of Justices Cardozo, Brandeis, Stone, and Roberts that the case should be dismissed but nevertheless reaching the merits in an opinion authored by Justice Cardozo).

Before analyzing whether the exactions in question were authorized under Congress's taxing power, it is useful first to clarify that neither an exaction's label nor its regulatory intent or effect is germane to the constitutional inquiry. To determine whether an exaction constitutes a tax, the Supreme Court has instructed us to look not at what an exaction is called but instead at what it does. *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (stating that when "passing on the constitutionality of a tax law," a court is "'concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it'") (quoting *Lawrence v. State Tax Comm'n*, 286 U.S. 276, 280 (1932)); *see also United States v. New York*, 315 U.S. at 515-16 (stating that an exaction meeting the definition of a tax will be construed as such regardless of "whatever name it may be called"). This makes sense, given that the Constitution itself uses four different terms to refer to the concept of taxation: taxes, imposts, duties, and excises. U.S. Const. art. I, § 8, cl. 1.[3]

Accordingly, the Supreme Court has characterized legislative acts as "taxes" without regard to the labels used by Congress. *See, e.g.*, *United States v. Sotelo*, 436 U.S. 268, 275 (1978) (deeming an exaction labeled a "penalty" in the Internal Revenue Code a tax for bankruptcy purposes); *License Tax Cases*, 72 U.S. (5 Wall.) 462, 470-71 (1866) (sustaining under the taxing power a federal statute requiring the purchase of a license before engaging in certain businesses and stating that "the granting of a license . . . must be regarded as nothing more than a mere form of imposing a tax"); *see also In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996) (holding that, for purposes of the AIA, "premiums" constituted taxes).

---

[3]Congress also does not have to invoke the source of authority for its enactments. "The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948).

Further, a tax—regardless of its label—"does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed." *United States v. Sanchez*, 340 U.S. 42, 44 (1950). As long as a statute is "productive of some revenue," Congress may exercise its taxing power without "collateral inquiry as to the measure of the regulatory effect [of the statute in question]." *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937). And if "the legislation enacted has some reasonable relation to the exercise of the taxing authority conferred by the Constitution, it cannot be invalidated because of the supposed motives which induced it." *United States v. Doremus*, 249 U.S. 86, 93 (1919).

I recognize that some cases from the 1920s and 1930s suggest that taxes are either regulatory or revenue-raising and that the former are unconstitutional. *See, e.g.*, *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 37-44 (1922) (holding that a tax on goods made by child labor was an unconstitutional penalty). However, both older and newer opinions indicate that the revenue-versus-regulatory distinction was short-lived and is now defunct. *See, e.g.*, *United States v. Kahriger*, 345 U.S. 22, 28 (1953) (upholding tax on bookmakers and stating, "It is conceded that a federal excise tax does not cease to be valid merely because it discourages or deters the activities taxed."), *overruled in part on other grounds*, *Marchetti v. United States*, 390 U.S. 39 (1968); *Sonzinsky*, 300 U.S. at 514 (1937 case upholding a tax on firearm dealers despite registration provision and alleged regulatory effects); *Doremus*, 249 U.S. at 95 (1919 case upholding the Narcotic Drugs Act, which taxed and regulated sales of narcotics); *McCray v. United States*, 195 U.S. 27, 59 (1904) (upholding tax on colored margarine and stating, "Since . . . the taxing power conferred by the Constitution knows no limits except those expressly stated in that instrument, it must follow, if a tax be within the lawful power, the exertion of that power may not be judicially restrained because of the results to arise from its exercise.").

It is not surprising that this distinction did not endure, given that taxes can, and do, both regulate and generate revenue at

the same time. Indeed, as the Supreme Court recognized in *Sonzinsky*, "[e]very tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. But a tax is not any the less a tax because it has a regulatory effect . . . ." 300 U.S. at 513. And "[i]n like manner every rebate from a tax when conditioned upon conduct is in some measure a temptation. But to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties." *Chas. C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 589-90 (1937). Accordingly, in *Bob Jones University v. Simon*, 416 U.S. 725 (1974), the Supreme Court recognized that, while in some early cases it "drew what it saw at the time as distinctions between regulatory and revenue-raising taxes," the Court "subsequently abandoned such distinctions." *Id.* at 741 n.12, *overruled in part on other grounds by South Carolina v. Ragan*, 465 U.S. 367, 379 (1984).

Courts, therefore, do not look to labels, regulatory intent, or regulatory effect. Instead, we must consider whether something that operates as a tax is authorized under Congress's taxing power, which has been described as "very extensive," *License Tax Cases*, 72 U.S. at 471, and indeed "virtually without limitation." *United States v. Ptasynski*, 462 U.S. 74, 79 (1983). As Justice Cardozo recognized in *Helvering*,

> The discretion [to tax and spend for the general welfare] belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, [or] not an exercise of judgment. This is now familiar law.
>
> "When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress."

301 U.S. at 640-41 (quoting *Butler*, 297 U.S. at 67).

There are essentially three features that a tax must exhibit to be constitutional. First, to pass constitutional muster, a tax must bear "some reasonable relation" to raising revenue. *Doremus*, 249 U.S. at 93. The amount of revenue raised is irrelevant: A tax does not cease to be one "even though the revenue obtained is obviously negligible, or the revenue purpose of the tax may be secondary." *Sanchez*, 340 U.S. at 44 (citations omitted). Instead, the measure must simply be "productive of some revenue." *Sonzinsky*, 300 U.S. at 514 (upholding tax that raised $5,400 in revenue in 1934).

Second, to be constitutional, a tax must be imposed for the general welfare. Congress enjoys wide discretion regarding what is in the general welfare. "The discretion . . . is not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment." *Helvering*, 301 U.S. at 640. Therefore, in determining whether a congressional enactment furthers the general welfare, "courts should defer substantially to the judgment of Congress." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

Finally, even if an exaction is rationally related to raising revenue and furthers the general welfare, to be constitutional, it must not infringe upon another constitutional right. For example, a tax may not infringe on an individual's right to be free from double jeopardy by further punishing criminal conduct. *See Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 780-83 (1994) (concluding that a drug tax was actually a criminal penalty based on its high rate, its deterrent purpose, and a criminal prohibition on the taxed activity and holding that the tax consequently violated the Double Jeopardy Clause of the Fifth Amendment).

B.

Turning now to the case at hand, the provisions at issue are the exaction provisions in the individual and employer man-

dates. I would conclude, after examining their practical opera-
tion, that these provisions impose taxes.

The individual mandate exaction in 26 U.S.C. § 5000A(b)
amends the Internal Revenue Code to provide that a non-
exempted individual who fails to maintain a minimum level
of insurance must pay a "penalty." Notably, while the individ-
ual mandate in some places uses the term "penalty," some
form of the word "tax" appears in the statute over forty times.
26 U.S.C. § 5000A. For example, it references taxpayers and
their returns, includes amounts due under the provision in the
taxpayer's tax return liability, calculates the penalty by refer-
ence to household income for tax purposes, and allows the
Secretary of the Treasury to enforce the provision like other
taxes (with several procedural exceptions). *Id.* Yet, as
explained above, the label applied to an exaction is irrelevant;
instead, in assessing an exaction's constitutionality, we look
to its practical operation.

The practical operation of the individual mandate provision
is as a tax. Individuals who are not required to file income tax
returns are not required to pay the penalty. *Id.* § 5000A(e)(2).
The amount of any penalty owed is generally calculated by
reference to household income and reported on an individu-
al's federal income tax return. *Id.* § 5000A(b)-(c).[4] Taxpayers
filing   jointly   are   jointly   liable   for   the   penalty.   *Id.*

---

[4]The statute prescribes monthly penalties in an amount calculated by
identifying a specified "percentage of the excess of the taxpayer's house-
hold income for the taxable year over the amount of gross income speci-
fied in section 6012(a)(1)" unless that calculation produces an amount that
is less than certain statutorily defined thresholds. 26 U.S.C. § 5000A(c)(2).
Ultimately, the penalty owed by a taxpayer is equal to the lesser of either
the sum of the monthly penalties owed by the taxpayer or the cost of the
"national average premium for qualified health plans which have a bronze
level of coverage, provide coverage for the applicable family size
involved, and are offered through Exchanges for plan years beginning in
the calendar year with or within which the taxable year ends." *Id.*
§ 5000A(c)(1).

§ 5000A(b)(3)(B). And the Secretary of the Treasury is empowered to enforce the provision like a tax, albeit with several procedural exceptions.[5] *Id.* § 5000A(g). The individual mandate exaction, codified in the Internal Revenue Code, therefore functions as a tax.

Looking next at the employer mandate exaction in 26 U.S.C. § 4980H, it amends the Internal Revenue Code to impose an "assessable payment" on large employers if a health exchange notifies the employer that at least one full-time employee obtains a premium tax credit or cost-sharing reduction. *Id.* § 4980H(a)-(b). The amount of the assessable payment is calculated differently based on whether the employer offers adequate health insurance coverage to its employees. *Id.* § 4980H(a)-(c). And instead of the term "penalty," the employer mandate uses the terms "assessable payment" and "tax." *Id.* § 4980H(b). Like the individual mandate exaction, the practical operation of this provision is as a tax that is assessed and collected in the same manner as other Internal Revenue Code penalties treated as taxes.[6] *Id.* § 4980H(d).

Having concluded that the individual and employer mandates operate as taxes,[7] to determine whether they are constitutional, I must consider whether they: 1) are reasonably

---

[5]The fact that Congress considered it necessary to exempt the individual mandate exaction from some traditional tax collection procedures like criminal liability and liens evidences that the exaction is a tax. 26 U.S.C. § 5000A(g)(2). Otherwise, there would be no need to except the exaction from some of the standard tax collection procedures, which otherwise apply.

[6]No exceptions to the standard collection procedures exist in the case of the employer mandate. 26 U.S.C. § 4980H(d).

[7]Since the Supreme Court long ago established that Congress did not have to invoke the word "tax" to act within its taxing power, Congress's use of other verbiage in portions of the individual and employer mandates, and most notably in the "penalty" provision of the individual mandate, sheds little light on Congressional intent. *See Nelson*, 312 U.S. at 363.

related to raising revenue; 2) serve the general welfare; and 3) do not infringe upon any other right.

The individual and employer exactions are surely related to raising revenue. The Congressional Budget Office estimated that the individual mandate exaction will generate approximately $4 billion annually, and the employer mandate exaction, $11 billion annually, by 2019. Letter from Douglas W. Elmendorf, Dir., Cong. Budget Office, to Hon. Nancy Pelosi, Speaker, U.S. House of Representatives, tbl. 4 (Mar. 20, 2010), *available at* http://www.cbo.gov/ftpdocs/113xx/ doc11379/AmendReconProp.pdf; *see also* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1563(a), 124 Stat. 119, 270 (stating that the Affordable Care Act "will reduce the Federal deficit"). Not only will the exactions raise significant amounts of revenue, but the revenue raised can cover the "[h]igher government costs attributable to the uninsured . . . implicitly paid for by the insured . . . through increased taxes or reductions in other government services as money is spent on the uninsured." Brief Amici Curiae of Economic Scholars in Support of Defendants-Appellees at 13, *Liberty Univ. v. Geithner*, No. 10-2347. In other words, as Judge Davis notes in his opinion, "[b]ecause the uninsured effectively force the rest of the nation to insure them with respect to basic, stabilizing care, this penalty is something like a premium paid into the federal government, which bears a large share of the shifted costs as the largest insurer in the nation." *Post* at 98. Clearly, then, the exactions bear "some reasonable relation" to raising revenue. *Doremus*, 249 U.S. at 93. *See also Sonzinsky*, 300 U.S. at 514 (upholding tax that raised $5,400 in revenue).

Further, the individual and employer mandate exactions serve the general welfare. The Affordable Care Act is aimed at, among other things, reducing the number of the uninsured as well as the cost of those who remain uninsured imposed on those who are insured. Congress found that, nationwide, hospitals provided $43 billion in uncompensated care to the unin-

sured in 2009 and that these costs were shifted onto insured individuals, "increas[ing] family premiums by on average over $1,000 a year." 42 U.S.C. § 18091(a)(2)(F). It also found that "[b]y significantly reducing the number of the uninsured, the [individual mandate], together with the other provisions of th[e] Act, will lower health insurance premiums." *Id.* By encouraging individuals to purchase health insurance and employers to provide it, the individual and employer mandates alleviate the costs associated with providing uncompensated care to the uninsured and lower health insurance premiums. Such cost reductions and expansions in access to health insurance surely constitute contributions to the general welfare.

Finally, neither the exaction in the individual mandate nor that in the employer mandate infringes on other rights. The exactions do not, for example, operate to impose duplicative criminal penalties in violation of the prohibition against double jeopardy. *See Kurth Ranch*, 511 U.S. at 780-83 ("Taxes imposed upon illegal activities are fundamentally different from taxes with a pure revenue-raising purpose that are imposed *despite* their adverse effect on the taxed activity."). The provisions lack the punitive character of other measures the Supreme Court has held to be penalties. *Id.*; *see also, e.g.*, *Bailey*, 259 U.S. at 36. And the provisions do not appear to violate any other rights: No one has a right to be free from taxation.[8]

## C.

It bears mention that the individual and employer mandate exactions do not run afoul of the constitutional requirement

---

[8]Additionally, any contention that the individual mandate violates either the First, Fifth, or Tenth Amendment is, in my opinion, meritless. *See post* at 105-109; *Florida ex rel. Atty. Gen. v. U.S. Dep't of Health & Human Servs.*, ___ F.3d ___, 2011 WL 3519178, at *113-17 (11th Cir. Aug. 12, 2011) (Marcus, J., dissenting).

that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." U.S. Const. art. I, § 9, cl. 4. This clause has its origins in the Constitutional Convention's slavery debates. The Northern states consented to count a slave as three-fifths of a person for allocating representatives in Congress in exchange for a corresponding increase in the tax liability of Southern states. Brian Galle, *The Taxing Power, the Affordable Care Act, and the Limits of Constitutional Compromise*, 120 Yale L.J. Online 407, 414 (Apr. 5, 2011), http://yalelawjournal.org/2011/4/5/galle.html. Even at that time, the definition of "direct" tax was unclear. *Id.*; *Springer v. United States*, 102 U.S. 586, 596 (1880) ("It does not appear that an attempt was made by any one to define the exact meaning of the language employed.").

It is therefore understandable that the Supreme Court has demonstrated reluctance to strike a tax based solely on the direct/indirect distinction. *See Knowlton v. Moore*, 178 U.S. 41, 83 (1900) ("[I]t is no part of the duty of this court to lessen, impede, or obstruct the exercise of the taxing power by merely abstruse and subtle distinctions as to the particular nature of a specified tax, where such distinction rests more upon the differing theories of political economists than upon the practical nature of the tax itself." (*quoting Nicol v. Ames*, 173 U.S. 509, 515 (1899)). Indeed, the Supreme Court restricted the meaning of "direct" taxes to capitation, or head taxes, and taxes on the ownership of real property. *Springer*, 102 U.S. at 602; *Veazie Bank v. Fenno*, 75 U.S. (8 Wall.) 533, 544 (1869). Taxes on personal property have also been held to be direct. *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 637 (1895), *superseded on other grounds by constitutional amendment*, U.S. Const. amend. XVI, as recognized in *Brushaber*, 240 U.S. 1.

The Supreme Court has never struck down a federal tax as an unapportioned capitation tax. And the Supreme Court has repeatedly upheld a variety of federal taxes as indirect and

therefore outside the apportionment requirement. *See Knowlton*, 178 U.S. at 83 (upholding a federal estate tax); *Bromley v. McCaughn*, 280 U.S. 124, 138 (1929) (upholding a federal gift tax); *United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 199 (1960) (upholding a federal estate tax collected on an insurance policy). As the Supreme Court has explained, "[a] tax laid upon the happening of an event, as distinguished from its tangible fruits, is an indirect tax which Congress . . . undoubtedly may impose." *Tyler v. United States*, 281 U.S. 497, 502 (1930).

The individual and employer mandate exactions are not capitation taxes; nor are they direct taxes that must be apportioned. Far from being imposed without regard to circumstance, they will be imposed only upon taxpayers who can afford, but fail to maintain, health insurance, or upon employers who fail to provide adequate and affordable insurance. *See* 26 U.S.C. §§ 4980H, 5000A. As taxes "laid upon the happening of an event," the individual and employer mandate exactions are clearly indirect. *See Tyler*, 281 U.S. at 502. Nor are they property taxes, since they will not be assessed based on the ownership of property.

Indeed, the Supreme Court has so limited the application of the Direct Tax Clause that the Sixth Circuit concluded that it "relates solely to taxation generally for the purpose of revenue only, and not impositions made incidentally under the commerce clause exerted either directly or by delegation, as a means of constraining and regulating what may be considered by the Congress as pernicious or harmful to commerce." *Rodgers v. United States*, 138 F.2d 992, 995 (6th Cir. 1943). Since the individual and employer mandate exactions are neither capitation nor property taxes, the Direct Tax Clause is inapplicable, and the individual and employer mandate taxes stand.

## III.

In sum, I concur in Judge Motz's fine opinion holding that the AIA applies here. Our distinguished colleague vigorously

dissents from our holding and presents a credible basis for upholding the constitutionality of the Affordable Care Act under the Commerce Clause. However, were I to rule on the merits, for the reasons given in this opinion, I would uphold the constitutionality of the Affordable Care Act on the basis that Congress had the authority to enact the individual and employer mandates, which operate as taxes, under its taxing power. Accordingly, I must agree with Judge Motz that the AIA bars this suit.

DAVIS, Circuit Judge, dissenting:

Today we are asked to rule on the constitutionality of core provisions of the Patient Protection and Affordable Care Act. Appellants advance several arguments against the Act, chief among them their claim that Congress exceeded its power when it sought to require all individuals (with narrow exceptions) to obtain a certain minimum of health insurance coverage starting in 2014. 26 U.S.C. § 5000A. In particular, appellants urge that the Commerce Clause, which authorizes Congress "To regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, allows only regulation of economic *activity*. Thus, they contend, Congress cannot regulate appellants' "decision not to purchase health insurance and to otherwise privately manage [their] own healthcare," which they characterize as "inactivity in commerce," Appellants' Br. 1. They also contend that upholding the Act under the Commerce Clause would "create an unconstitutional national police power that would threaten all aspects of American life," *id.* at 11, suggesting in particular that "Congress could require that people buy and consume broccoli at regular intervals" or that "everyone above a certain income threshold buy a General Motors automobile," Appellants' Reply Br. 9 (quoting *Florida ex rel. Bondi v. Dep't of Health and Human Servs.*, ___ F. Supp. 2d ___, ___, 2011 WL 285683, at *24 (N.D. Fla. Jan. 31, 2011), *aff'd in part and rev'd in part sub nom. Florida v. U.S. Dept. of Health & Human Servs.*, ___ F.3d ___, 2011 WL 3519178 (11th Cir. Aug. 12, 2011)).

Appellants bring a similar facial challenge to the Act's employer mandate, and they also assert Free Exercise, Establishment Clause, and Equal Protection claims against the Act.

My good colleagues in the majority hold that the Anti-Injunction Act strips us of jurisdiction in this case. For reasons I explain at length below, I disagree. As I reject the reasoning and the result of the majority's jurisdictional analysis, I am entitled to reach the merits of appellants' claims. Reaching the merits, I would hold that the challenged provisions of the Act are a proper exercise of Congress's authority under the Commerce Clause to regulate the interstate markets for health services and health insurance. I do not believe that constitutional review of the Act requires courts to decide whether the Commerce Clause discriminates between activity and inactivity. But even if I were to assume appellants were "inactive," I could not accept appellants' contention that a distinction between "activity" and "inactivity" is vital to Commerce Clause analysis. I would therefore affirm the district court's dismissal of appellants' suit.

Appellants raise two major concerns about upholding the Act: first, they believe that individual liberty is infringed when the federal government is permitted to regulate *involuntary* market participants; second, they fear that our liberty will be further eroded in the future, as a ruling sustaining the Act would permit Congress to establish arbitrary purchase mandates. Because I take these concerns very seriously, I explain at some length why the Act is a far more limited exercise of federal power than appellants fear.

## I.   Anti-Injunction Act

### A.   My View

The majority concludes that the Anti-Injunction Act (AIA) applies to the challenged provisions of the Affordable Care Act, depriving us of subject-matter jurisdiction. Although the

parties argue that we have jurisdiction, "federal courts have an independent obligation to . . . raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, ___ U.S. ___, ___, 131 S. Ct. 1197, 1202 (2011).

Before today, nine federal judges had expressly considered the application of the Anti-Injunction Act, and all nine held it inapplicable to the Affordable Care Act's mandates. *See Thomas More Law Center v. Obama*, ___ F.3d ___, ___, 2011 WL 2556039, at *6-*8 (6th Cir. June 29, 2011); *Goudy-Bachman v. United States Dept. of Health & Human Servs.*, 764 F. Supp. 2d 684, 695-97 (M.D. Pa. 2011); *Liberty University, Inc. v. Geithner*, 753 F. Supp. 2d 611, 627-29 (W.D. Va. 2010); *United States Citizens Ass'n v. Sebelius*, 754 F. Supp. 2d 903, 909 (N.D. Ohio 2010); *Florida ex rel. McCollum v. United States Dept. of Health & Human Servs.*, 716 F. Supp. 2d 1120, 1130-44 (N.D. Fla. 2010); *Thomas More Law Center v. Obama*, 720 F. Supp. 2d 882, 890-91 (E.D. Mich. 2010); *Virginia ex rel. Cuccinelli v. Sebellius*, 702 F. Supp. 2d 598, 603-605 (E.D. Va. 2010). Although the two circuit courts that have considered challenges to the mandates have split, all six members of those panels agreed that the courts should reach the merits; only the Sixth Circuit panel thought it necessary to discuss the AIA. *Florida v. U.S. Dept. of Health & Human Servs.*, ___ F.3d ___, 2011 WL 3519178 (11th Cir. Aug. 12, 2011) (reaching the merits without raising the applicability of the AIA); *Thomas More Law Center*, ___ F.3d at ___, 2011 WL at *6-*8 (expressly holding the AIA does not apply). For the following reasons, I agree with these judges and would hold that the AIA does not strip us of jurisdiction in this case.

The Anti-Injunction Act, originally enacted in 1867, directs that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person," certain enumerated exceptions aside. 26 U.S.C.

§ 7421(a).[1] Thus, we have jurisdiction only if the penalty provisions attached to the challenged mandates do not constitute "tax[es]" for purposes of the AIA.[2]

The Sixth Circuit recently held that the individual mandate's penalty provision was not a "tax" within the meaning of the AIA. *Thomas More Law Center*, ___ F.3d at ___, 2011 WL at *6-*8. Its reasoning is straightforward: Congress spoke only of "tax[es]" in the Anti-Injunction Act, while it deemed the amount owed by those in violation of the individual mandate a "penalty." *See id.* at *7; *compare* 26 U.S.C. § 7421(a) *with id.* § 5000A(b), (c), (e), (g). And Congress did not simply use the term "penalty" in passing: Congress refers to the exaction no fewer than seventeen times in the relevant provision, and each time Congress calls it a "penalty."

In fact, Congress considered earlier versions of the individual mandate that clearly characterized the exaction as a "tax" and referred to it as such more than a dozen times. *See* H.R. 3962, § 501, 111th Cong. (2009) ("impos[ing] a tax" in section entitled "Tax on individuals without acceptable health care coverage," and repeatedly referring to this exaction as a "tax"); H.R. 3200, § 401, 111th Cong. (2009) (same); S. 1796, § 1301, 111th Cong. (2009) ("impos[ing] a tax" in section

---

[1]Although appellants also requested declaratory relief, the Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996). In any case, the Declaratory Judgment Act expressly excludes claims "with respect to Federal taxes." 28 U.S.C. § 2201(a). The Supreme Court has held this exclusion to be "at least as broad as the Anti-Injunction Act." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.7 (1974).

[2]This question of statutory interpretation is wholly distinct from the *constitutional* question concerning Congress's power under the Taxing and Spending Clause, U.S. Const. art. I, § 8, cl. 1, to enact these mandates. Because I would hold the Act constitutional under the Commerce Clause, I need not and do not reach the latter issue.

entitled "Excise tax on individuals without essential health benefits coverage," and repeatedly referring to exaction as a "tax"). Congress deliberately deleted all of these references to a "tax" in the final version of the Act and instead designated the exaction a "penalty." As the Supreme Court noted in *INS v. Cardoza-Fonseca*, "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." 480 U.S. 421, 442-43 (1987). Thus, it seems odd for the majority to ignore Congress's deliberate drafting decision to call the exaction a "penalty" rather than a "tax."

When Congress has wished "penalties" to be treated as "taxes," it has said so expressly. In Subchapter A of Chapter 68 of the Internal Revenue Code, Congress directed that "any reference in this title [Title 26 of the United States Code (the Internal Revenue Code)] to 'tax' imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter." *Id.* § 6665(a)(1). Likewise, in Subchapter B of that chapter, Congress instructed that "any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter." *Id.* § 6671(a). Yet, Congress chose to place the individual mandate and its "penalty" provisions not in Chapter 68 but in Chapter 48, which contains no such instructions. Though Congress did provide that this penalty "be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68," and Chapter 68 "penalties" are treated as "taxes," the term "assessment and collection like a tax" does not imply that the penalty should be treated as a tax for any and all other purposes. *Id.* § 5000A(g)(1). As the Sixth Circuit recently observed, "Congress said one thing in sections 665(a)(2) and 6671(a), and something else in section 5000A, and we should respect the difference." *Thomas More*, 2011 WL at *7.

"Where, as here, resolution of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson*, 465 U.S. 886, 896 (1984). Courts look to legislative history first to see whether it indicates that Congress intended a particular result and then, if not, to find evidence of the purposes of the statute. *Cf. Dolan v. United States Postal Service*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute . . . ."). Even if the statutory text were unclear here, legislative history indicates that the AIA should not apply.

Legislative history of the Affordable Care Act reveals that Congress never considered application of the Anti-Injunction Act. Nowhere in the Act's voluminous legislative history can I find a single reference to the AIA. And when members of Congress discussed the inevitable judicial review of the Affordable Care Act, no one appears to have contemplated that the AIA might bar such review for the five years, post-enactment, that would have to elapse before a tax refund suit could be brought.

Looking, then, to legislative purpose, it appears that immediate judicial review of the individual mandate would do little to frustrate the aims of the AIA. The Anti-Injunction Act was intended to "protect[ ] the expeditious collection of revenue." *South Carolina v. Regan*, 465 U.S. 367, 376 (1984). Revenue from the individual mandate's penalty provision will not be assessed and collected until the year after the mandate becomes operative—2015. Judicial review of the mandate in 2011 most assuredly will not frustrate "the expeditious collection of revenue" four years later. I also note that Congress forbid the Internal Revenue Service from employing its primary enforcement mechanisms to collect this penalty: the IRS may not seek the institution of criminal prosecutions by the Justice Department or impose a lien or levy on an individual's prop-

erty for failure to pay the penalty. 26 U.S.C. § 5000A(g)(2). This indicates that Congress had scant concern for "the expeditious collection of revenue" from the penalty provision.

A failure to provide immediate judicial review in reliance on a rather strained construction of the AIA, on the other hand, might undermine the core purpose of the Affordable Care Act. In the absence of a conclusive ruling from the federal courts, some individuals may well decide for themselves that the Act is unconstitutional and thus can be ignored. In the case of an ordinary tax this would simply result in some lost revenue and the costs of tax prosecutions; here, it would push the nation farther from Congress's goal of attaining near-universal health insurance coverage. And, as leaving the constitutionality of the Act unsettled would seem likely to create uncertainty in the health insurance and health care industries, which might depress these major sectors of the economy, it seems that application of the AIA would be at cross-purposes with the Act's reforms. Thus, I believe that there is ample reason for me to conclude that Congress had no design that the Anti-Injunction Act might apply to the individual mandate's penalty provisions.

The question of our jurisdiction over appellants' challenge to the analogous penalty attached to the employer mandate presents a closer question. That exaction is termed "an assessable payment" in the provision that imposes it, but it is then twice referred to as a "tax" in later, qualifying provisions. *Compare Id.* § 4980H(a) *with id.* § 4980H(b)(2), (c)(7). "The . . . ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Given these mixed references, and mindful of the Supreme Court's warning in *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940), that "[t]o take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the

discovery of the purpose of the draftsmen of a statute," I find the text of the employer mandate provision ambiguous on the application of the Anti-Injunction Act.

Thus, I would again look to legislative history and Congressional purpose. *Cf. SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350-51 (1943) (Jackson, J.) (explaining that our canons of statutory construction "long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy"). For the reasons stated above, I would hold that Congress did not intend the Anti-Injunction Act to block timely judicial review of the employer mandate provisions. Accordingly, I would hold that we have jurisdiction to consider all of appellants' claims.

## B. Majority's View

The majority's contrary conclusion relies on two arguments, neither of which I find convincing. First, the majority contends that "the Supreme Court has repeatedly instructed that congressional labels have little bearing on whether an exaction qualified as a 'tax' for statutory purposes" and that "the Court has specifically found an exaction's label immaterial to the applicability of the AIA," displacing the ordinary methods of statutory interpretation with a functional analysis of the challenged exactions. *Ante* pp. 25-26. Thus, in the majority's view, "it is simply irrelevant what the 2010 Congress would have thought about the AIA; all that matters is whether the 2010 Congress imposed a tax." *Ante* p. 36. Second, the majority asserts that "[t]he Supreme Court has concluded that the AIA uses the term 'tax' in its broadest possible sense" and thus that this functional analysis sweeps quite broadly: the majority holds that "the AIA prohibits a pre-enforcement challenge to any exaction that is made under

color of their offices by revenue officers charged with the general authority to assess and collect the revenue." *Ante* p. 22 (internal quotation marks and braces omitted).

1.

The majority's functional approach hinges on its interpretation of two Supreme Court cases from 1922: *Bailey v. George*, 259 U.S. 16 (1922), and *Lipke v. Lederer*, 259 U.S. 557 (1922). I read these cases differently from the manner in which the majority reads them. Because the majority's view of *George* and *Lipke* brings these cases into conflict, I believe my approach, which harmonizes them, is preferable.

The majority asserts that in *Lipke* "the Court . . . specifically found an exaction's label immaterial to the applicability of the AIA." *Ante* p. 26. The *Lipke* Court held that "[t]he mere use of the word 'tax' in an act primarily designed to define and suppress crime is *not enough* to show that *within the true intendment of the term* a tax was laid." 259 U.S. at 561 (emphases added). That is, "[t]he mere use of the word 'tax'" in a criminal statute—particularly where, as in the statute at issue in *Lipke*, the word "tax" is immediately followed by the word "penalty"—is not dispositive of Congress's "true inten[t]" regarding application of the AIA. *Id.* This is an ordinary exercise in statutory interpretation, not an instruction from the Court to disregard Congressional designations as "immaterial to the applicability of the AIA." *Ante* p. 26.

The Court did go on to examine the function of the exaction, noting that "[w]hen by its very nature the imposition is a penalty, it must be so regarded," but it did *not* do so in the course of an ordinary application of the AIA. *Lipke*, 259 U.S. at 561. Rather, it is clear that the Court considered the function of the exaction because that function (as a criminal penalty) was relevant to the Court's due process concerns. It was to resolve this constitutional problem, *not* simply to construe

the word "taxes" in the AIA, that the Court looked to the exaction's function.

Thus, the Court reasoned,

> Before collection of taxes levied by statutes enacted in plain pursuance of the taxing power can be enforced, the taxpayer must be given fair opportunity for hearing; this is essential to due process of law. And certainly we cannot conclude, *in the absence of language admitting of no other construction*, that Congress intended that penalties for crime should be enforced through the secret findings and summary action of executive officers. The guaranties of due process of law and trial by jury are not to be forgotten or disregarded.

*Id.* at 562 (emphasis added). This passage strongly indicates that the Court was applying the canon of constitutional avoidance, construing the exaction at issue together with the AIA so as not to run afoul of due process. *Cf. South Carolina v. Regan*, 465 U.S. 367, 398-400 (1984) (O'Connor, J., concurring in the judgment) (relying on doctrine of constitutional avoidance to interpret the AIA not to apply to original jurisdiction of the Supreme Court). The functional analysis was required by the Court's constitutional concerns, as due process is triggered when the penalty is criminal, whatever its designation by Congress. As the AIA was simply being interpreted to accord with the *constitutional* mandate of due process—which binds Congress and thus of course requires that we look beyond Congressional labels to the nature and function of the exaction—*Lipke* did not establish a new methodology for construing "taxes" under the AIA. Instead, it recognized that the term "taxes" in the AIA is flexible, like nearly all statutory language, and may admit to alternative constructions. And it affirmed that a court's goal when applying the AIA, like any other statute, is to do so in accord with the "true intendment" of Congress. *Id.* at 561.

This reading of *Lipke* harmonizes it with the two *Bailey* cases. As the majority explains, the Supreme Court considered a tax refund suit in *Bailey v. Drexel Furniture Co.* and held the Child Labor Tax Law unconstitutional as a "penalty" rather than a "tax." 259 U.S. 20, 38-39 (1922). The same day, in *Bailey v. George*, the Court dismissed, pursuant to the AIA (§ 3224, precursor to the modern AIA), a pre-collection suit alleging the Child Labor Tax Law was unconstitutional. 259 U.S. 16 (1922). The *George* Court's reasoning is extremely brief (in a one-page opinion): "The averment that a taxing statute is unconstitutional does not take this case out of [the AIA]." *Id.* at 20. The question, of course, is *why* the statute, though an unconstitutional exercise of the taxing power per *Drexel Furniture*, is still "a taxing statute" for purposes of the AIA.

My answer is the more straightforward one: it constitutes a "taxing statute" for purposes of the AIA because it *purported* to be a taxing statute and appeared to be one on its face—that is, because it was designated as a taxing statute by Congress. *See Drexel Furniture*, 259 U.S. at 34 (noting exaction was called "Tax on Employment of Child Labor," part of "An act to provide revenue . . ."). Thus, the Court provided no explanation because it relied on the most obvious reason for deeming the statute at issue a "taxing statute." The majority disagrees, arguing that "the Court *never mentioned* the statutory label" in *George* and that "it [does not] seem plausible that the Court implicitly relied on that label, given that it had never before and has never since found an exaction's label controlling for statutory purposes." *Ante* p. 27.

Under the majority's approach, the *George* Court must have conducted a functional analysis of the exaction and determined that it qualified as a tax. Yet this supposed functional analysis appears nowhere in the opinion. It is difficult to believe that the Court would not bother to specify any criteria for determining when an exaction is functionally a tax, given that the Court had just held the statute *not* to qualify as

a tax for constitutional purposes in *Drexel Furniture*. If the *George* Court were relying on anything beyond the face of the statute, surely the Court would have provided some explanation of why the enactment qualified as a tax under the AIA but not under the Taxing and Spending Clause.

More troubling still, the majority's reading of *George* brings it into conflict with *Lipke*. Under the majority's approach, the Court in *George* must have simply recognized that "the AIA . . . [reaches] any exaction that is made under color of their offices by revenue officers charged with the general authority to assess and collect the revenue." *Ante* 22 (internal quotation marks and braces omitted). But these criteria fail to distinguish the "penalty" in *Lipke*, which was held to be *outside* the AIA. The "penalty" in *Lipke* also met the majority's criteria: the National Prohibition Act simply doubled taxes already assessed and collected by the Commissioner, 41 Stat. 305, 317-18 (1919), which were laid down in the Revenue Act of 1918 "on all distilled spirits," and were "to be paid by the distiller or importer when withdrawn, and collected under the provisions of existing law," 40 Stat. 1057, 1105, Title VI — Tax on Beverages, § 600(a). That the Court found the exaction tantamount to a criminal penalty does not change this.[3] Thus, by the majority's understanding of the

---

[3]The majority attempts to sidestep this conflict, nicely arguing that the Act "did not authorize the collector to make an assessment under his general revenue authority" because "it converted him into a federal prosecutor." *Ante* p. 28-29. But the constitutional failings of the Act does not change the fact that the Commissioner would be collecting the challenged tax "under his general revenue authority." The Act did not provide any separate mechanism for the assessment and collection of this tax, or even expressly assign those duties to the Commissioner; it simply stated that "a tax shall be assessed . . . and collected . . . in double the amount now provided by law" from those illegally manufacturing or selling alcohol. Thus, the Commissioner could only perform such assessments and collections under the "general revenue authority" granted by the Internal Revenue Code. 41 Stat. at 318. That such assessments violated due process does not change the fact that the revenue officers doing the assessment would be acting "under color of their offices." *Ante* p. 22 (internal quotation marks omitted).

AIA, there should have been *no room* for constitutional avoidance, and the Court in *Lipke* should have held the AIA applicable and refused jurisdiction.[4]

The majority seems to recognize that *Lipke* may appear problematic, but it contends that it is not. It argues that "*Lipke* held only that when Congress converts the tax assessment process into a vehicle for *criminal* prosecution, the Due Process Clause prohibits courts from applying the AIA." *Ante* p. 29. That was the core holding of *Lipke*, yes, but the question is whether the Court's construction of the AIA *in reaching that holding* accords with the majority's rigid interpretative regime constructed ninety years later.[5] Under the majority's proposed construction, the term "tax" in the AIA reaches *all* exactions which the Commissioner is empowered to collect. *Ante* pp. 22-23. Yet, the *Lipke* Court held that the AIA did *not* reach such an exaction. Though the majority would prefer that *Lipke* "create[d] only a narrow constitutional limitation" to the AIA, *ante* p. 29, the Court's holding is simply *not* framed as creating an exception to the AIA. Rather, the Court explained that it "constru[ed]" the term "tax" in the AIA (in accord with "Congress['s] inten[t]") and held that it was not so broad. 229 U.S. at 561-62. The majority's view of the AIA, and its corresponding interpretation of these cases, inescapably places *George* and *Lipke* in conflict.

My reading of these cases, which is fully consistent with my approach to the AIA, harmonizes them. Under my view

---

[4]This was the view of the dissenting opinion in *Lipke*, which relied on *George*. *See Lipke*, 259 U.S. at 563 (Brandeis, J., dissenting) ("The relief should therefore be denied, whatever the construction of section 35, tit. 2, of the Volstead Act, and even if it be deemed unconstitutional. *Compare Bailey v. George*, 259 U. S. 16, 42 Sup. Ct. 419, 66 L. Ed. 816, decided May 15, 1922.").

[5]Indeed, the rigidity of the majority's approach prompts a reminder that we confront here the court's statutory jurisdiction, not its Article III jurisdiction. Congress grants, and Congress restricts, as it chooses, the statutory jurisdiction of the lower federal courts.

of *Lipke*, the AIA's "taxes" is recognized to be, like any statutory language, a flexible term that must be interpreted in accord with Congressional intent and, when applicable, bounding constitutional mandates. In many cases, Congress's decision to designate something a "tax" will prove dispositive—indeed, the designation did so in *Bailey v. George*. *Lipke* simply reflects the recognition that Congress's use of the word "tax" in an otherwise non-tax provision (followed closely by the word "penalty") does not invariably *mandate* that the AIA be applied—constitutional concerns can override congressional designations. This is fully in accord with my view of the AIA and its relation to subsequent enactments, particularly an expansive programmatic enactment such as the ACA that would alter the fabric of many layers of American life.[6]

The majority cites several other cases for the proposition that we are to ignore Congressional designations when applying the AIA, instead asking only whether an exaction is intrinsically a tax according to its "nature and character." *Ante* p. 25 (quoting *Helwig v. United States*, 188 U.S. 605, 613 (1903)). I will briefly discuss two of them.

*Helwig v. United States*, for instance, concerned the interaction of a statute that imposed "a further sum" when importers declared a value more than 10% lower than customs' subsequent appraisal and a statute that gave federal district courts exclusive jurisdiction over "penalties" and "forfeitures." The passage the majority excerpted from is quite instructive:

---

[6]In this regard, Justice O'Connor nicely captured the essential purpose of the AIA when she declared: "The AIA 'depriv[es] courts of jurisdiction to resolve abstract tax controversies . . . .'" *South Carolina v. Regan*, 465 U.S. 367, 386 (1984) (O'Connor, J., concurring in the judgment); *and see id.* at 392 ("the Act generally precludes judicial resolution of all abstract tax controversies . . ."). The essential issues presented in this case are about as far from "abstract tax controversies" as one can get.

> Although the statute . . . terms the money demanded as "a further sum," and does not describe it as a penalty, still the use of those words does not change the nature and character of the enactment. Congress may enact that such a provision shall not be considered as a penalty or in the nature of one, with reference to the further action of the officers of the government, or with reference to the distribution of the moneys thus paid, or with reference to its effect upon the individual, *and it is the duty of the court to be governed by such statutory direction*, but the intrinsic nature of the provision remains, and, *in the absence of any declaration by Congress affecting the manner in which the provision shall be treated*, courts must decide the matter in accordance with their views of the nature of the act.

188 U.S. 605, 612-13 (emphases added). Thus, the Court emphasized that it looked to "the nature and character of the enactment" *only* "in the absence of any declaration by Congress" giving direction to the court. Far from supporting the majority's claim that "[t]he Supreme Court has repeatedly instructed that congressional labels have little bearing on whether an exaction qualifies as a 'tax' for statutory purposes," *Helwig* indicates that Congressional labels that *direct the court* may of course be dispositive. Terming an exaction "a further sum" did not help the Court determine whether or not that sum was a "penalty"; but Congress's expressly considering calling an exaction a "tax" and then deleting the dozens of references to a "tax" and instead designating it a "penalty" (as Congress did in the course of its enactment of the ACA) *does* help courts determine whether Congress wished us to view the exaction as a "tax" for purposes of the AIA.[7] Though Congress did not expressly reference the AIA

---

[7]The majority focuses on *Helwig*'s use of the phrase "with reference to," suggesting that *Helwig* would have us consider Congressional direction

here—and, judging from the legislative history, may well not have considered application of the AIA specifically—it did consider whether to attach all the trappings of a "tax" to the exaction (including, among many others provisions, the AIA), and decided instead to specify the ones it wanted. The AIA is not among them.

The majority's second citation for that proposition, *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, (1996), is much like *Helwig*. There the Court determined whether a "tax" imposed on certain funding deficiencies constituted an "excise tax" for Chapter 11 purposes (as "an excise tax" was accorded higher priority than ordinary claims). It prefaced its discussion by recognizing that "Congress could have included a provision in the Bankruptcy Code calling [the relevant] exaction an excise tax . . . ; the only question is whether the exaction ought to be treated as a tax (and, if so, an excise) without some such dispositive direction." *Id.* at 219. Its ultimate conclusion considered legislative history of the exaction at issue and "conclude[d] that the 1978 Act reveals no congressional intent to reject generally the interpretive principle that characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context . . . ." *Id.* at 224. Here, where Congress provided one of the

---

here only if it is expressly labeled as being made "'with reference to" the AIA." *Ante* 25 n.5. But that very sentence in *Helwig* goes on to describe such direction as "any declaration by Congress *affecting the manner in which the provision shall be treated*." 188 U.S. at 613 (emphasis added). The following citations to "statute after statute" which the majority references are part of the Court's analysis, the Court tells us, because it must determine whether the "words [employed by Congress] are not regarded by Congress as imposing a penalty and [thus] should not be so treated by the court," for "[i]f it clearly appear that it is the will of Congress that the provision shall not be regarded as in the nature of a penalty, the court must be governed by that will." *Id.* I do not mean to suggest that *Helwig* teaches that "an exaction's label controls," *ante* p. 25 n.5, only that any Congressional direction that indicates "the will of Congress" on the application of the AIA should be considered.

most direct signals it can of its intentions—it expressly considered calling the exaction a "tax" and ultimately decided not to do so—*Helwig* and *Reorganized CF & I* would direct us to *follow Congress's direction* and treat an exaction denominated a "penalty" as a penalty and not as a tax for purposes of the AIA.

2.

Second, the majority's approach relies upon its assertion that "[t]he Supreme Court has concluded that the AIA uses the term 'tax' in its broadest possible sense" and thus that "the AIA prohibits a pre-enforcement challenge to any exaction that is made under color of their offices by revenue officers charged with the general authority to assess and collect the revenue." *Ante* p. 22 (internal quotation marks and braces omitted).

This definition is far from self-evident. As the majority concedes, taxes and penalties are distinguished in *some* federal statutory "contexts." *Ante* p. 24 n.4. In the very case discussed above, *Reorganized CF & I Fabricators*, which dates from 1996, the Court adopted these definitions for its "functional" inquiry of the exaction at issue: "A tax is an enforced contribution to provide for the support of government; a penalty . . . is an exaction imposed by statute as punishment for an unlawful act." 518 U.S. at 224. The majority reasons that "[n]either the Secretary nor the Sixth Circuit cites a single case suggesting that [this distinction applies to the AIA]." *Ante* p. 24 n.4. Of course, *Lipke*, on which the majority relies, is one major AIA case that distinguishes between taxes and penalties. And, as the Court in *Reorganized CF & I Fabricators* borrowed its definitions of "tax" and "penalty" from a "somewhat different context," it appears that these definitions are not particularly context-specific. 518 U.S. at 224. Thus, if a court is to perform a "functional examination" of its own, why would it not use these well-settled definitions, under

which the Affordable Care Act's exaction would clearly be a penalty (for noncompliance with the individual mandate)?

By my count, the majority puts forward three affirmative arguments favoring the "broadest possible" definition for the word "taxes" in the AIA: (1) *Snyder v. Marks*, 109 U.S. 189 (1883), established a broad definition of "tax" under the AIA; (2) the twin *Bailey* cases show that the AIA is "broader" than the taxing clause; and (3) the fact that the IRS grants the Secretary the authority to make "assessments of all taxes (*including* interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title" implies that the AIA, which generally protects the Government's interest in effecting unfettered tax assessments, must apply to all exactions. 26 U.S.C. § 6201(a) (emphasis added). I find these arguments unpersuasive.

First, *Snyder* does not establish the broad definition the majority cites it for. The Court explains that "tax" "meant that which is in condition to be collected as a tax, *and is claimed by the proper public officers to be a tax*." 109 U.S. at 192 (emphasis added). Thus, *Snyder* clearly makes relevant the Commissioner's designation of an exaction and, reasonably viewed, requires that the Commissioner "claim[ ]" an exaction "to be a tax." Here, of course, the Secretary of the Treasury is a party before us and supports Congress's designation of the mandate as a "penalty" rather than a "tax."[8]

Second, the *Bailey* cases have already been dealt with at length above. I agree that they show that the AIA is "broader" than the taxing clause when applied to exactions that are *des-*

---

[8]The majority believes the "fundamental problem with this argument is that the Secretary still does 'claim' that the challenged exaction is a 'tax,' albeit one authorized by the Constitution's Taxing Clause." *Ante* p. 28 n.7. As *Snyder* is discussing the use of the word "tax" in the precursor to the modern AIA, I read *Snyder* to refer to the Commissioner's designation with respect to the statute.

*ignated by Congress as "taxes"*—in the limited sense that they include some exactions that purport to be taxes yet are unconstitutional—but they do no more than that.

As for the majority's final argument, it seems to require a logical leap. I reproduce the relevant paragraph for ease of reference:

> The Court's broad interpretation of the AIA to bar interference with the assessment of any exaction imposed by the Code entirely accords with, and indeed seems to be mandated by, other provisions of the Internal Revenue Code. The AIA does not use the term "tax" in a vacuum; rather, it protects from judicial interference the "*assessment . . . of any tax*." I.R.C. § 7421(a) (emphasis added). The Secretary's authority to make such an "assessment . . . of any tax" derives directly from another provision in the Code, which charges the Secretary with making "assessments of all taxes (*including* interest, additional amounts, additions to the tax, and assessable *penalties*) imposed by this title." § 6201(a) (emphases added); *see also* § 6202 ("assessment of any internal revenue tax" includes assessment of "penalties"). *Thus, for purposes of the very assessment authority that the AIA protects, Congress made clear that "penalties" (as well as "interest, additional amounts, [and] additions to the tax") count as "taxes." Congress must have intended the term "tax" in the AIA to refer to this same broad range of exactions. See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context.").

*Ante* p. 22-23 (large emphasis mine).

I agree, of course, that "for purposes of the [Secretary's] assessment authority," Congress made clear that the 'penal-

ties' . . . count as 'taxes.'" Indeed, where Congress has wished "penalty" to be treated as a "tax," it has said so. *See, e.g.*, 26 U.S.C. §§ 6665(a)(2), 6671(a) (directing that "tax" be "deemed also to refer to . . . penalties" in Chapter 68 of the Internal Revenue Code). It is not at all surprising that Congress has employed this shorthand when defining the Secretary's authorities.

The problematic leap is this: simply because the AIA generally protects the Secretary's assessment authority does not mean that the AIA must apply to *all* exactions. The many exemptions included in the AIA as currently codified show that Congress has often wished to exempt certain exactions from the AIA. As a matter of statutory interpretation, it seems improper for a court to insist that "taxes" means *any* exaction (despite the fact that Congress does not say so) and thereby to undercut Congress's deliberate decision to reject designating an exaction as a "tax" and instead to call it a "penalty." Given that we have been cited no cases that would require such a large redrafting of the AIA—other "penalties" to which the AIA have been applied were placed in Chapter 68, which expressly directs that all references to "tax" in the IRC are to refer also to the Chapter's "penalties"—I believe that this "broadest possible" interpretation of the AIA is unwarranted and unwise.

The majority appears to reject the legal force of sections 6665(a)(2) and 6671(a), arguing that section 7806(b) "forbid[s] courts from deriving any 'inference' or 'implication' from the 'location or grouping of any particular section or provision or portion of this title.'" *Ante* p. 31. This puzzles me, as it is absolutely clear that sections 6665(a)(2) and 6671 have the force of law. Section 6665(a)(2) directs that "any reference in this title to 'tax' imposed by this title shall be deemed also to refer to . . . penalties provided by this chapter." This instructs courts that Congress wished to make the word "penalty" inclusive of the word "tax" *in this particular chapter* (Chapter 68). Congress remains free to do otherwise

in other chapters; indeed, it chose not to do so in Chapter 48, in which the individual mandate is found. Giving force to section 6665(a)(2) in no way contradicts section 7806(b) by drawing a prohibited implication from the "location or grouping" of Internal Revenue Code (IRC) provisions. Section 7806(b) prohibits inferences drawn *from the location or group* itself; instructions can still flow from section 6665(a)(2) that are to apply only to a specified chapter. This seems to me to be beyond serious doubt. Likewise, section 7806(b) does not prohibit courts interpreting one provision of the IRC from looking to other provisions of the IRC and noting that, where Congress has desired a particular result, it has stated so. To suggest that a court cannot draw the traditional inference from Congress's decision to define "penalty" as inclusive of "tax" in other chapters and its failure to do so here seems wholly unwarranted by section 7806(b).[9]

In the final analysis, the majority's approach essentially imposes a clear-statement rule on Congress, making the AIA applicable to *all* exactions, regardless of statutory language and in disregard of apparent Congressional intent, unless Congress had the foresight to expressly exempt an exaction from the AIA. The majority concedes, as it must, that the 111th Congress could have exempted the individual mandate from the AIA, but it suggests that the *only way* Congress could avoid the AIA's bar on immediate judicial review of the ACA is by amending the AIA itself to include an express exemption for the ACA or (in what amounts to the same thing) by referencing the AIA by name in the ACA. That is, the majority seems to believe that a clear-statement rule is operative here, and that absent a clear statement regarding the inapplicability

---

[9]I do not suggest that "we [should] infer from § 6665(a)(2) a *categorical exclusion* from the term 'tax' of all non-Chapter 68 penalties." *Ante* p. 31 (emphasis added). Rather, the fact that Congress has directed us to treat *some* "penalties" as "taxes" simply makes it less likely that Congress desired this result where it enacted no such direction (and in fact expressly rejected the term "tax" for the term "penalty").

of the AIA, it must apply to any and all exactions. Given that the Supreme Court has never recognized such a clear-statement rule, it seems to me that this turns the ordinary principles of statutory interpretation on their head.

As Justice Kennedy recently recognized for a plurality of the Court, clear-statement rules are designed to "avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality op.). Justice Kennedy even warned in his plurality opinion against "convert[ing] the clear statement rule from a principle of interpretive caution into a trap for an unwary Congress." *Id.* That seems to be precisely what the majority does today.

Presumably because the majority believes such a clear-statement rule applies, it asserts that "[t]o infer an intent on the part of the 2010 Congress to implicitly exempt this pre-enforcement challenge from the AIA bar would be tantamount to inferring an implicit repeal of that bar." *Ante* p. 36. But our case is nothing like implicit repeal cases like *TVA v. Hill*, 437 U.S. 153 (1978), which the majority cites in that paragraph. In *Hill*, the Court considered whether continued federal appropriations for a dam after notice that construction was being challenged under the Endangered Species Act worked an implicit repeal of the Act with respect to the dam. In an implicit repeal case, the Court is forced to consider whether Congressional action *definitively to the contrary* of an earlier enactment works an implied repeal. In our case, on the other hand, we are simply asking *whether* Congress *created* with the ACA the sort of exaction to which the earlier act (the AIA) applies. This requires us to construe both the word "taxes" under the AIA and the word "penalty" in the ACA, applying our ordinary tools of statutory interpretation. We look first to the text itself, and, after finding that it is at best ambiguous, we look to legislative history and Congressional purpose. Because the application of the AIA to the ACA is *in*

*doubt*—this is precisely the question we are deciding *sua sponte*—our case is nothing like implicit repeal cases.

Of course, my approach fully recognizes that the AIA has legal force. But, as the AIA can undoubtedly be sidestepped by any Congress as it creates a new exaction (at the very least, in the majority's view, by a clear statement that the AIA is not to apply), the AIA *is* non-binding on future Congresses. When courts determine the application of the AIA to the ACA, they are only considering the application of one Congressional enactment to a later one. Because one Congress cannot bind a later one, the 111th Congress was fully within its prerogative to indicate, even if only implicitly, that the AIA should not apply. *See United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996) (plurality op.) (quoting Blackstone for "the centuries-old concept that one legislature may not bind the legislative authority of its successors"). The independent legal force of the AIA does not spring from the fact that it can trap future, unwary Congresses, but rather from the fact that we must seek to harmonize its terms with that of future legislation. That is, the AIA is not binding on *Congress*, it is binding on *us, the judiciary*.

Finally, as for the majority's suggestion that policy arguments favor its position because a contrary holding "might have serious long-term consequences for the Secretary's revenue collection," *ante* p. 38, I would simply note again that the Secretary of the Treasury is a party before us and argues that the AIA does not apply. Indeed, I cannot find a Supreme Court case where the AIA has been applied over the objection of the Secretary.

3.

The majority suggests that the issue presented here is one of "context," and I agree. The majority accepts "the Sixth Circuit's general observation that there are 'contexts' in which the law treats 'taxes' and 'penalties' as mutually exclusive"

and explains that "[t]he question here is whether the AIA is one of these 'contexts.'" *Ante* p. 24 n.4 (internal quotation marks omitted). To my mind, the proper question is not whether "taxes" and "penalties" are always "mutually exclusive" under the AIA, but whether Congress, in creating a later-enacted exaction, intended to create a "tax" for purposes of the AIA. But the more important question of "context" is this: whether, in light of the context provided by Congress's deliberate decision to designate the individual mandate's exaction a "penalty" rather than a "tax" and the evidence of Congress's desire to erect no jurisdictional bar to immediate judicial review of the ACA, we should nonetheless interpret the ACA as creating a "tax" within the meaning of the AIA. My effort here, to marshal the historical, jurisprudential, interpretive, and, yes, commonsense factors necessary to answer this question, persuades me that we should not. Given this larger context, I do not believe that one interpretation of near century-old AIA cases—cases that fail to devote enough space to the AIA analysis to even spell out their reasoning—should carry the day. If the Supreme Court's vacillations concerning the proper interpretation of the AIA teach us anything, they teach us that context matters.[10]

\* \* \* \*

Because I do not believe that *Lipke* and *George* instruct courts to eschew our ordinary methods of statutory interpretation and I do not agree that the AIA reaches *all* exactions

---

[10]Justice Powell summarized the history of the AIA as follows, in part:

> [T]he Court's unanimous opinion in *Williams Packing* indicates that the case was meant to be the capstone to judicial construction of the Act. It spells an end to a cyclical pattern of allegiance to the plain meaning of the Act, followed by periods of uncertainty caused by a judicial departure from that meaning, and followed in turn by the Court's rediscovery of the Act's purpose.

*Bob Jones Univ.*, 416 U.S. at 742. Rediscoveries of congressional intent abound in the law and should not surprise us.

though by its terms it is limited to "taxes," I cannot join the majority. Where Congress expressly rejected the term "tax" in favor of "penalty," and where it appears that application of the AIA would do little to further the purposes of the AIA, but would do much to frustrate the Affordable Care Act's reforms desired by the Congress that approved the Act, I would hold that the AIA does not strip us of jurisdiction. Thus, I would reach (and I do indeed reach) the merits of appellants' challenges.

## II.   The Act

After a months-long national debate, the Patient Protection and Affordable Care Act was signed into law on March 23, 2010. Pub. L. No. 111-148, 124 Stat. 119, *amended by* The Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010). The Affordable Care Act is comprised of a half-dozen initiatives designed to reduce the costs of health care and the number of Americans who remain uninsured.

First, the Act creates "health benefit exchanges" in each state, which are regulated to increase transparency concerning premium increases and claim denials and which offer market-based incentives tied to increases in efficiency and better health outcomes. 42 U.S.C. § 18031(e), (g).

Second, the Act prevents insurers from rejecting applicants with preexisting conditions (the "guaranteed issue" requirement) and bars insurers from charging higher premiums to those with serious medical conditions or a history of past illness (the "community rating" requirement). *Id.* §§ 300gg – 300gg-3.

Third, the Act makes more Americans eligible for Medicaid, and to many of those who earn too much to receive Medicaid it grants tax credits to subsidize the cost of insurance premiums and pledges federal dollars to reduce out-of-pocket

expenses. *Id.* §§ 1396a(10)(A)(i)(VIII), 18071; 26 U.S.C. § 36B.

Fourth, the Act requires that individuals keep up "minimum essential [health insurance] coverage." *Id.* § 5000A. In particular, it directs that "[a]n applicable individual shall for each month beginning after 2013 ensure that the individual, and any [applicable] dependent . . ., is covered under minimum essential coverage for such month." *Id.* Appellants term this the "individual mandate," and it is the chief target of their suit. Appellants' Br. 3. Congress found that hospitals provided $43 billion in uncompensated care to the uninsured in 2009, and that these costs were shifted onto insured individuals, "increas[ing] family premiums by on average over $1,000 a year." 42 U.S.C. § 18091(a)(2)(F). It also found that, "[b]y significantly lowering the number of the uninsured, the [minimum coverage] requirement, together with the other provisions of th[e] Act, will lower health insurance premiums." *Id.*

Congress created two religious exemptions to the individual mandate: a religious conscience exemption and a health-care sharing ministry exemption. 26 U.S.C. § 5000A(d)(2). I discuss the particulars of these exemptions in Part VIII, where I consider appellants' First Amendment claims.

Fifth, the Act created tax incentives making it more affordable for small businesses to offer health insurance to their employees. *Id.* § 45R.

Finally, the Act required "applicable large employers . . . to offer to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" if at least one full-time employee is receiving federal subsidies for health insurance. *Id.* § 4980H(a). Appellants call this the "employer mandate." Appellants' Br. 3.

Appellants Michele Waddell, Joanne Merrill, and Liberty University assert an array of constitutional challenges to the

Act's individual and employer mandates and request declaratory and injunctive relief. They allege that the mandates are outside Congress's Article I powers and that the individual mandate's religious exemptions effect violations of the First Amendment's Free Exercise and Establishment Clauses as well as the equal protection component of the Fifth Amendment's Due Process Clause. Appellants' chief contention is that the individual mandate was not validly enacted pursuant to Congress's commerce power because it regulates what they call "inactivity." *Id.* at 1. The district court carefully parsed appellants' arguments and dismissed their suit pursuant to Federal Rule of Civil Procedure 12(b)(6), concluding that appellants had failed to state a legally sufficient claim. *Liberty University, Inc. v. Geithner*, 753 F. Supp. 2d 611 (W.D. Va. 2010). For the following reasons, I would affirm.

### III.   Constitutionality, Inactivity Aside

Putting aside appellants' "inactivity" argument, to which I return in Parts IV and V, I first consider whether the Act is otherwise authorized under Congress's "power to regulate activities that substantially affect interstate commerce." *Gonzalez v. Raich*, 545 U.S. 1, 16-17 (2005). In particular, I ask whether the Act runs afoul of the teachings of *United States v. Lopez* and *United States v. Morrison*, two cases in which the Supreme Court enforced limits on the Commerce Clause so as not to "convert congressional authority under the Commerce Clause to a general police power." *Lopez*, 514 U.S. 549, 567 (1995); *see Morrison*, 529 U.S. 598, 617-19 (2000).

### A.   *Lopez* and *Morrison*

In *Lopez* and *Morrison* the Supreme Court struck down two congressional enactments because the objects of regulation—the possession of guns in school zones in *Lopez*, violence against women in *Morrison*—were noneconomic. Affirming that "Congress' commerce authority includes the power to regulate those activities having substantial relation

to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce," *Lopez* held that gun possession in schools did not substantially affect interstate commerce. 514 U.S. at 559-60 (internal citations omitted). The Court worried that to identify the effect of guns in schools on interstate commerce it "would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567. If gun possession in schools were held to be substantially related to interstate commerce simply because such incidents harmed our "national productivity," then "Congress could regulate any activity that it found was related to the economic productivity of individual citizens" and it would be "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." *Id.* at 564.

*Morrison* further clarified the holding of *Lopez*. The Court explained that "a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case." 529 U.S. at 610. Without "express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone," the Court refused to find a substantial effect upon interstate commerce, as it believed "the link between gun possession and . . . interstate commerce was attenuated." *Id.* at 612. The Court noted that it has "upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Id.* at 613. Because the *Morrison* Court found that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity" and that their effects on interstate commerce (many of which were expressly enumerated by Congress) are "attenuated," it struck down the challenged congressional regulation of these crimes. *Id.* at 613, 615. As it did in *Lopez*, the Court emphasized that the "regulation . . . of intrastate violence . . . has always been the province of the States" and affirmed that "[t]he Constitution requires a dis-

tinction between what is truly national and what is truly local." *Id.* 617-18.

Without doubt, appellants are correct to insist that *Lopez* and *Morrison* remind us that any formulation of the Commerce Clause must admit to limiting principles that distinguish the "truly national" from the "truly local." But the concern directly animating *Lopez* and *Morrison*—the noneconomic character of the regulated activities—is not present in this case, where the failure to obtain health insurance is manifestly an economic fact with direct effects on the interstate markets for both health insurance and health services. *Cf. Thomas More*, ___ F.3d at ___, 2011 WL at *11-12 (Martin, J.); *Florida*, ___ F.3d, at ___, 2011 WL at *94, *106 (Marcus, J., dissenting).

Nor can it be said that health insurance or health services have "always been the province of the states" in the way that education, family law, and criminal law have been. *Raich*, 529 U.S. at 618. Since the Social Security Act of 1965, Pub. L. No. 89-97, 79 Stat. 286, established Medicare and Medicaid benefits, the federal government has been the single largest provider in the interstate health insurance market and the largest purchaser in the health services market. Federal dollars have accounted for more than one-quarter of all health spending each year since 1974; in 2008, Americans spent $2.3 billion on health services, of which the federal government paid more than $815 million—nearly 35%. Ctrs. for Medicare & Medicaid Servs., National Health Expenditure Amounts by Type of Expenditure and Source of Funds: Calendar Years 1965-2019. The year 1974 also saw the passage of the Employee Retirement Income Act (ERISA), which has a "broadly worded" and "clearly expansive" preemption provision. 29 U.S.C. § 1144(a); *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 146 (2001). Through ERISA, as well as later enactments like the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, the federal government has come to occupy much of the

field of the regulation of health benefits, and many state and local attempts to regulate health insurance have been held pre-empted. *See, e.g.*, *Retail Industry Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) (holding Maryland's Fair Share Health Care Fund Act, which regulated employer health care spending, preempted by ERISA, as "ERISA establishes comprehensive federal regulation of employers' provisions of benefits to their employees"); *but see Metropolitan Life Ins. Co. v. Mass.*, 471 U.S. 724 (1985) (holding that state mandated-benefit law survives ERISA preemption as a law that "regulates insurance, banking, or securities" within the meaning of ERISA's savings clause). Given nearly half a century of extensive federal involvement in the national health insurance and health services sectors, it seems clear that *Lopez* and *Morrison*'s interest in protecting areas of traditional state sovereignty is not directly implicated.

That said, *Lopez* and *Morrison* do remind us that the scope of the Commerce Clause is finite and that its jurisprudence must admit to bounding principles. Thus courts must assure themselves that upholding the Act under the Commerce Clause would not effectively create a federal police power.

### B. Substantial Effects

Appellants argue that if we were to hold that failure to obtain insurance substantially affects interstate commerce, we would be forced to find that the failure to purchase *any* marketed product substantially affects interstate commerce. Thus, they quote *Florida ex rel. Bondi*, where the district court for the Northern District of Florida found the Act unconstitutional in part because it believed that a Commerce Clause broad enough to authorize the Act must also support purchase mandates for broccoli or GM cars. Appellants' Reply Br. 9 (quoting *Bondi*, ___ F. Supp. 2d at ___, ___, 2011 WL 285683, at *24). The Eleventh Circuit, upholding the district court on that point, expressed similar fears that there are no "cogniza-

ble, judicially administrable limiting principles." *Florida*, ___ F. 3d at ___, 2011 WL at *54. This is not so.

I begin by noting that whether failure to purchase insurance substantially affects interstate commerce relies on a great number of factual determinations. These are to be made not by the courts but by Congress, an institution with far greater ability to gather and critically evaluate the relevant information. As the Supreme Court noted in *Raich*, "[i]n assessing the scope of Congress' authority under the Commerce Clause, . . . [our] task . . . is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." 545 U.S. at 22.

The Act's effects on interstate commerce depend in large part on an unusual feature of the health care market. By federal law, a hospital participating in Medicare must stabilize any patient who arrives at its emergency room, regardless of the patient's ability to pay for treatment, Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd(b)(1), and many states impose similar requirements, *see, e.g.*, H.R. Rep. No. 99-241(III), at 5 (1985), *reprinted in* 1986 U.S.C.C.A.N. 726, 726-27 (noting that "at least 22 states have enacted statutes or issued regulations requiring the provision of limited medical services whenever an emergency situation exists" and that "many state court rulings impose a common law duty on doctors and hospitals to provide necessary emergency care"). As a result, the uninsured often receive care that they are unable to pay for: in 2008, hospitals provided $43 billion in uncompensated care to the uninsured. 42 U.S.C. § 18091(a)(2)(F). To cope with these costs, hospitals increase the price of health care services, which in turn leads to rising health insurance premiums; Congress found that "[t]his cost-shifting increases family premiums by on average over $1,000 a year." *Id.*

Recognizing these direct effects on the health insurance and health services markets does not require us to "pile inference

upon inference" in the way linking noneconomic acts like the possession of guns in schools or gender-motivated violence to interstate commerce might have done in *Lopez* and *Morrison*. *Lopez*, 514 U.S. at 567; *see Morrison*, 529 U.S. at 615. In *Lopez*, the Court rejected the Government's argument that gun possession in schools substantially affected interstate commerce due to the general "costs of crime" or because "the presence of guns in schools poses a substantial threat to the education process," which "in turn, will result in a less productive citizenry." 514 U.S. at 564. Likewise, the Court rejected Congress's findings in *Morrison* because they "follow[ed] the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce," chiefly "deterring potential victims" from interstate travel, employment, general commercial transactions, "diminishing national productivity, increasing medical and other costs, and decreasing the supply of and demand for interstate products." 529 U.S. at 615 (quoting H.R. Rep. No. 103-711, at 385 (1990), *reprinted in* 1994 U.S.C.C.A.N. 1803, 1853). Where the proffered "substantial effects" in *Lopez* and *Morrison* were attenuated, here the effects are direct: considered as a class (per *Wickard* and *Raich*'s aggregation principle, *see Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942); *Raich*, 545 U.S. at 22; *post* pp. 88-90), those who fail to purchase health insurance will seek and receive medical care they cannot afford; the cost of that care ($43 billion in 2008) is borne by the hospitals, which are forced to increase the price of health care services.

And recognizing that the uninsured's passing on $43 billion in health care costs to the insured constitutes a substantial effect on interstate commerce in no way authorizes a purchase mandate for broccoli or any other vegetable. The health care market is unique in that its product (medical care) must be provided even to those who cannot pay, which allows some (the uninsured) to consume care on another's (the insured's) dime. Here the substantial effect on commerce comes not from simply manipulating demand in a market, as it would in

the case of a broccoli or GM car mandate, but from correcting a massive market failure caused by tremendous negative externalities. Thus, we need not decide today whether the reasoning of *Wickard* and *Raich*, which were both concerned in part about limiting supply in interstate markets for fungible goods, extends to artificially inflating demand via a purchase mandate. *See Wickard*, 317 U.S. at 128 (recognizing that even wheat grown for home consumption "overhangs the market and if induced by rising prices tends to flow into the market and check price increases"); *Raich*, 545 U.S. at 19 (noting that "high demand in the interstate market"—and consequent higher prices—is likely to "draw [home consumed] marijuana into that market").

For these reasons, I would hold that the failure to obtain health insurance substantially affects the interstate markets for health insurance and health care services. *Accord Thomas More*, ___ F.3d at ___, 2011 WL at *12 (Martin, J.); *id.* at *24-25 (Sutton, J.); *Florida*, ___ F.3d at ___, 2011 WL at *106 (Marcus, J., dissenting).

IV.   Universal Participation in the Health Care Market

Nor need I decide today whether the Commerce Clause discriminates between activity and inactivity. Appellants concede that virtually all persons will voluntarily enter into the interstate health services market in their lifetimes, and they concede further, as they must, that this constitutes activity in commerce. Yet appellants insist that the Commerce Clause requires Congress to adopt an extremely narrow time-horizon: it may regulate persons seeking health care, but *only once they have sought it*. Appellants' Br. 34. A faithful application of *Wickard*'s and *Raich*'s teachings requires us to reject this contention.

*Wickard* introduced the aggregation principle into Commerce Clause jurisprudence: "That appellee's own contribution to the demand for wheat may be trivial by itself is not

enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." 317 U.S. at 127-28. *Raich* reaffirmed this approach, noting that Commerce Clause analysis looks to the regulated "activities, taken in the aggregate." 545 U.S. at 22.

Further, *Raich* emphasized that

> Congress [need not] legislate with scientific exactitude. When Congress decides that the "total incidence" of a practice poses a threat to a national market, it may regulate the entire class. *See United States v. Perez*, 402 U.S. at 154-55 ("[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so."). In this vein, we have reiterated that when a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.

*Id.* at 17 (some internal quotation marks and citations omitted).

Under *Wickard* and *Raich*, we are to take the view of the legislators, not those who are regulated. Courts look at the aggregated impact of an activity, not the impact of individuals; the Commerce Clause authorizes the regulation of an "entire class," regardless of "the *de minimis* character of individual instances." *Id.* We are to put aside "the mechanical application of legal formulas" and look instead to "the actual effects of the activity in question upon interstate commerce." *Wickard*, 317 U.S. at 120, 124. Indeed, it bears repeating, our task in deciding Commerce Clause challenges "is a modest one" in which we ask "only whether a 'rational basis' exists" for Congress to find a substantial effect on interstate commerce. *Id.* at 22.

Considering that hospitals are required to provide certain care to the uninsured, that illness and accidents are nothing if not unpredictable, and that the costs of medical care are often catastrophic, I have no hesitation in concluding the Congress rationally determined that addressing the $43 billion annual cost-shifting from the uninsured to the insured could only be done via regulation *before* the uninsured are in need of emergency medical treatment. *Wickard* and *Raich* teach that we are to take the longer view of legislators; it is difficult to imagine that Commerce Clause analysis would aggregate individuals and allow regulation of entire classes but then, when legislators confront a problem requiring a remedy before emergencies (and their ever-growing costs) occur, refuse to permit them to adopt the time-horizon necessary to enact a solution. *Accord Florida*, ___ F.3d at ___, 2011 WL at *93 (Marcus, J., dissenting).

Thus, as Congress rationally found virtually universal participation in the interstate health care market over the course of residents' lifetimes, the Act does not present an issue of congressional regulation of inactivity. *Accord Thomas More*, ___ F.3d at ___, 2011 WL at *15 (Martin, J.); *id.* at *27-30 (Sutton, J.); *Florida*, ___ F.3d at ___, 2011 WL at *93-*94 (Marcus, J., dissenting). Rather, courts are asked to pass on regulation of voluntary participation in the interstate health care market that, to be effective, must be preemptive. As it is clear that the regulated behavior substantially affects interstate commerce and appellants bring no other challenge to Congress's authority under the Commerce Clause, I would hold the Act to be a proper exercise of congressional power.

## V.   Regulating Inactivity

But even if I were to assume that the uninsured are, in appellants' phrase, "inactive in commerce," I would be bound to uphold the Act. Despite appellants' several arguments, the Commerce Clause is not offended by the regulation of "inactivity" or, in proper circumstances, by a purchase mandate.

Appellants urge that the Act is an "unprecedented attempt to force private citizens who have decided not to participate in commerce to engage in commerce by mandating that they purchase . . . health insurance . . . ." Appellants' Br. 3. This argument presents two distinct questions: (1) "[w]hether Congress has authority under the Commerce Clause to regulate a private citizen's inactivity in commerce"; and (2) whether such regulation can include "forc[ing] [a] citizen to participate in commerce by mandating that she purchase a [commodity] . . . or pay a penalty for noncompliance." *Id.* at 1. I consider these questions in turn.

## A.    Regulating "Inactivity in Commerce"

Appellants characterize Mss. Waddell's and Merrill's "decision not to purchase health insurance and to otherwise privately manage her own healthcare" as "inactivity in commerce," which they claim is beyond the reach of the Commerce Clause. *Id.* at 1. As the following brief review of the case law will show, this broader Commerce Clause challenge—whether it reaches non-market participants (those "inactiv[e] in commerce")—has already been litigated. The Supreme Court's "case law firmly establishes" that Congress may regulate those who have opted not to participate in a market when their self-provisioning, considered in the aggregate, "substantially affect[s]" an interstate market. *Raich*, 545 U.S. at 17. After explaining why appellants' broader challenge is foreclosed, I consider the far narrower challenge to the Act that survives.

### 1.    Regulating Non-Market Participants

Nearly seventy years ago, in the famous case of *Wickard v. Filburn*, the Supreme Court upheld Congress's power under the Commerce Clause to regulate Mr. Filburn's private, noncommercial production of wheat. The Court squarely confronted the question: it began its discussion by noting that "[t]he question would merit little consideration . . . except for

the fact that this Act extends federal regulation to production not intended in any part for commerce but wholly for consumption on the farm." 317 U.S. at 118. Just six years ago, the Court reaffirmed *Wickard*'s vitality in *Raich*, explaining,

> Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce. As we stated in *Wickard*, "even if appellee's activity be local *and though it may not be regarded as commerce*, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce."

*Raich*, 545 U.S. at 17 (quoting *Wickard*, 317 U.S. at 125) (emphasis added). The *Raich* Court made clear that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18. Applying this principle, the Court upheld the regulation of individuals who grew marijuana solely for "home consumption"—that is, it allowed Congress to regulate individuals who deliberately chose not to participate in commerce. *Id.*

Thus, appellants' true quarrel with the Act is more limited than their language sometimes suggests. With subheadings like "*Wickard* does not support the district court's conclusion that private economic decisions can be regulated under the Commerce Clause," appellants' briefs muddy their real point. Appellants' Br. 20. As just described, it is well settled that Congress may regulate the *private, noncommercial* economic activities of *non-market participants* when their self-provisioning (growing wheat or marijuana for themselves) substantially affects an interstate market. Appellants contend that this "firmly establishe[d]" Commerce Clause law, *Raich*, 545 U.S. at 17, is inapplicable because *Wickard* and *Raich*

"involved voluntary *activity*, whereas the Act regulates voluntary *inactivity*." Appellants' Br. 19. To the extent that "voluntary *inactivity*" again suggests deliberate non-participation in the market, this fails to distinguish *Raich*; yet appellants also seem to be raising a different point. "[I]t was the fact that Mr. Filburn actively grew wheat beyond the quota, even if for personal use, that was significant in *Wickard*," as "it was that activity that constituted economic activity. By contrast, [appellants] have exerted no effort and used no resources." *Id.* at 21. It is *this* "distinction between *activity* and *inactivity*," *id.* at 19—*absolute* inactivity, not just inactivity (non-participation) in commerce—that carries the true thrust of appellants' argument.

## 2. Regulating the "Inactive"

Before I can consider this narrower argument, I must be sure I understand exactly what appellants mean by it. Appellants say that "Mr. Filburn actively grew wheat beyond the quota, even if for personal use" while Ms. Waddell and Mrs. Merrill "have exerted no effort and used no resources." Appellants' Br. 21. But appellants expressly state that "Miss Waddell and Mrs. Merrill have voluntarily and deliberately decided not to purchase health insurance, but *to instead save for and privately manage health care*." *Id.* at 10 (emphasis added). It is not clear why "sav[ing] for and privately manag-[ing] health care," a species of what economists call "self-insurance,"[11] requires neither "effort" nor "resources"—in

---

[11]*Cf.* 42 U.S.C. § 18091(a)(2)(A) ("In the absence of the [individual mandate], some individuals would make an economic and financial decision to forego health insurance coverage and attempt to self-insure . . . ."). Because individuals who self-insure are unable to shift risk in the way that market insurance does, self-insurance is far more common among collectives or businesses, where it may be efficient. *See generally* M. Moshe Porat, Uri Spiegel, Uzi Yaari, Uri Ben Zion, *Market Insurance Versus Self Insurance: The Tax-Differential Treatment and Its Social Cost*, 58 J. Risk & Ins. 657 (1991); Patrick L. Brockett, Samuel H. Cox, Jr., and Robert C. Witt, *Insurance Versus Self-Insurance: A Risk Management Perspective*, 53 J. Risk & Ins. 242 (1986); Isaac Ehrlich, Gary S. Becker, *Market Insurance, Self-Insurance, and Self-Protection*, 80 J. Pol. Econ. 623 (1972).

fact, one would imagine that "sav[ing]" requires "resources" (namely, money) and that "manag[ing]" requires some "effort." *Id.* at 10, 21. Though, unlike wheat and marijuana, insurance is intangible, appellants do not suggest that interstate markets in intangible goods or services are less subject to regulation under the Commerce Clause than markets in tangible goods; thus, it is difficult to see why the legal import of the appellants' "sav[ing]" and "manag[ing]" should differ from that of Mr. Filburn's sowing and harvesting.

But even if appellants had said nothing about saving and managing and I accepted that Ms. Waddell and Mrs. Merrill had truly "exerted no effort and used no resources" with respect to health insurance—that is, that they had taken no steps to self-insure—it is difficult to make out the legal relevance of this point. Mr. Filburn and Ms. Raich deliberately chose to meet their own needs rather than enter commerce and purchase goods on the market and thus they, too, "exerted no effort and used no resources" in connection to the relevant markets; why are they more susceptible to Commerce Clause regulation than appellants simply because they *privately* exerted effort and expended resources for a *noncommercial* end?

Appellants have provided no express answer, but one is implicit in their arguments: in choosing to act, even privately, with notice of regulation, one can be said to consent or at least submit to that regulation. Under this view, *Wickard* and *Raich* are distinguishable because they concerned regulated domains which individuals voluntarily entered upon the commencement of some "activity." Thus, appellants' complaint that "appellants in *Raich* could avoid Congress' reach by not manufacturing or possessing marijuana, but here the Appellants cannot avoid Congress' reach even if they are not doing anything." Appellants' Br. 19. Appellants express concern throughout their brief about allowing Congress to "regulate [people] because they are legal citizens who merely exist," *id.*

at 20;[12] likewise, the Eleventh Circuit majority worries that "[i]ndividuals subjected to this economic mandate have not made a voluntary choice to enter the stream of commerce . . . ." *Florida*, ___ F.3d at ___, 2011 WL at *48. So I will consider the Commerce Clause ramifications of regulating "everyone."

### 3. Federalism & Regulations Affecting Everyone

I am aware of no "substantial effect" case, in more than a century of Commerce Clause jurisprudence, that looks beyond the class of *activities* regulated to the class of *persons* affected. And this is unsurprising, as the dispositive question is whether the object of regulation substantially affects interstate commerce; what the affected persons have done to consent (or not) to the regulation is obviously irrelevant to that inquiry. Appellants claim that their liberty concern springs from the principles of federalism rather than black-letter Commerce Clause law. Though these principles serve to protect state sovereignty and the resulting division of power helps to secure our liberty, federalism is not an independent font of individual rights.

As Justice Kennedy explained in his concurrence in *Lopez*, "it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one," as power could be split between state and federal governments even before each government's powers were further separated among legislative, executive, and judicial departments. 514 U.S. at 576. Thus, "[s]tate sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York v. United States*, 505 U.S. 144, 181 (1992) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)). Federalism "enhance[s]" our liberty by disaggregating power; it

---

[12]It is no coincidence that "voluntary" or "voluntarily" appears twenty-eight times in appellants' briefs.

helps to secure all our individual rights, but it does not create new ones. The Supreme Court's recent decision in *Bond v. United States*, which granted an individual criminal defendant *standing* to challenge a federal statute on the grounds that it usurped powers reserved to the states and which discussed at length the ways in which federalism protects individual liberty, is not to the contrary. 564 U.S. ___, ___, 131 S. Ct. 2355, 2364 (2011). Appellants provide no support for their suggestion that some novel, heretofore unknown, individual right can spring from the principles of federalism.

Federalism was properly invoked in *Lopez* and *Morrison*, where, to police the division of authority between state and federal governments, the Court struck down federal regulation of noneconomic activity within "areas such as criminal law enforcement or education where States historically have been sovereign." *Lopez*, 514 U.S. at 564; *see Morrison*, 529 U.S. at 599. *Lopez* and *Morrison*'s concern about the loss of state authority within areas traditionally reserved to the states implicates the division of power between state and federal governments and thus goes to the very core of federalism. Appellants' individual liberty concerns do not. Appellants suggest that allowing the Act to touch all U.S. residents, whether or not they have voluntarily entered a regulated domain, "threatens . . . the bedrock concept[ ] of . . . individual freedom." Appellants' Br. 11-12. Federalism does not speak to this issue.

Nor does any recognized individual right. Appellants' rhetoric sometimes suggests a generalized right to be left alone; but outside of a limited right to privacy concerning "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy," including those "relating to marriage, procreation, contraception, family relationships, child rearing, and education," *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 851 (1992), no such right exists. And any such right springing from substantive due process would bind the states under the

Fourteenth Amendment as well as the federal government under the Fifth, placing universal regulation outside the reach of any government.

Moreover, an extensive body of federal laws, many passed pursuant to the Commerce Clause, targets all U.S. residents: federal criminal law. Indeed, *Raich* itself concerned the Controlled Substances Act and the noncommercial production and consumption of marijuana; nowhere in *Raich* did the Court intimate concern that the federal government was regulating the drug use of "everyone . . . just for being alive and residing in the United States." *Bondi*, ___ F. Supp. 2d. at ___, 2011 WL 285683, at *20. Though penalties do not attach until someone has violated the statute, the same is true of the Act's regulation. Of course, appellants suggest that compelling action is less legitimate under the Commerce Clause than prohibiting action. I take up that question next.

## VI.   Compelling Action

Having established that the regulation of "inactivity in commerce" does not offend the Commerce Clause, I consider whether federal commerce regulation can properly "force [a] citizen to participate in commerce by mandating that she purchase a [commodity] . . . or pay a penalty for noncompliance." Appellants' Br. 1.

As I explained at length above, the Supreme Court has taught that an enactment is authorized by the Commerce Clause where Congress could rationally conclude that the object of regulation substantially affects interstate commerce. This inquiry looks only at the relation between the object of regulation and interstate commerce; the content of the regulation—what it compels or prohibits—is irrelevant. Indeed, it has long been recognized that "[t]he power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution." *Wickard*,

317 U.S. at 124 (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942)); *cf. Raich*, 545 U.S. at 29 ("[S]tate action cannot circumscribe Congress' plenary commerce power."). The Necessary and Proper Clause makes clear that we are to defer to Congress with respect to the means it employs to effectuate legitimate ends. U.S. Const. art. I, § 8, cl. 18. In combination with the Commerce Clause, it empowers Congress "'to take all measures necessary or appropriate to' the effective regulation of the interstate market." *Raich*, 545 U.S. at 38 (Scalia, J., concurring) (quoting *Shreveport Rate Cases*, 234 U.S. 342, 353 (1914)).

But even if it were appropriate to review the method of regulation Congress has chosen to employ, I would find that the individual mandate fits well within the range of acceptable commercial regulations.

## A.  The Act Does Not Compel Citizens to Enter Commerce

I first note that the Act does not "force" any citizen to enter commerce. Appellants' Br. 1. Instead, residents are given a choice between obtaining health insurance (by market purchase or otherwise) and paying a non-punitive tax penalty that, by law, is capped at "the national average premium for qualified health plans which have a bronze level of coverage." 26 U.S.C. § 5000A(c)(1)(B); *see id.* at § 5000A(b)(1). As the average cost of providing the most basic insurance, this amount should roughly approximate the expected costs to the regulatory scheme (in the form of higher premiums) occasioned by an individual's failure to procure insurance. Because the uninsured effectively force the rest of the nation to insure them with respect to basic, stabilizing care, this penalty is something like a premium paid into the federal government, which bears a large share of the shifted costs as the largest insurer in the nation.

## B.   History of Compelled Purchases

Even if the individual mandate were properly characterized as compelling residents to enter the market, this has long been an acceptable form of regulation under the Commerce Clause. For instance, the Federal Motor Carrier Safety Administration, acting pursuant to the Motor Carrier Act of 1980, requires that motor carriers purchase either liability insurance or a surety bond in order to ensure that they are able to pay for damage they may cause. *See* 49 C.F.R. § 387. And the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) requires that the owner of property contaminated by a hazardous substance "provide removal or remedial action"—likely requiring resort to the market—on pain of liability for punitive damages, even where the owner bears "no[ ] culpability or responsibility for the contamination" and indeed is entirely "passiv[e]." 42 U.S.C. § 9607(c)(3); *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 846-47 (4th Cir. 1992). CERCLA has survived all Commerce Clause challenges, and it was expressly held a proper exercise of Congress's Commerce Clause power by the Second Circuit Court of Appeals. *See Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 203 (2d Cir. 2002), *cert. denied*, 538 U.S. 998 (2003); *cf. United States v. Olin Corp.*, 107 F.3d 1506, 1511 (11th Cir. 1997) (holding CERCLA constitutional Commerce Clause legislation as applied to appellants).

*Wickard* itself suggests that compelled purchases are permissible. The Court explained:

> It is said, however, that this Act, *forcing some farmers into the market to buy* what they could provide for themselves, is an unfair promotion of the markets and prices of specializing wheat growers. It is of the essence of regulating that it lays a restraining hand on the selfinterest of the regulated and that advantages from the regulation commonly fall to others.

> . . . And with the wisdom, workability, or fairness, of the plan of regulation we have nothing to do.

317 U.S. at 129 (emphasis added). When describing how non-commercial wheat production decreased demand for market wheat, the Court explained that it "forestall[ed] resort to the market" and "supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market." *Id.* at 127, 128. Though *Wickard* did not involve an express purchase mandate, the Court understood that Mr. Filburn was effectively being "forc[ed] . . . into the market to buy" wheat when it rejected his Commerce Clause challenge. *Id.* at 129.

C.    Compelled Purchases as Government's Core Function

Finally, I pause to consider why purchase mandates—whether they be for health insurance or broccoli—occasion such fear of federal aggrandizement. *Cf. Thomas More*, ___ F.3d at ___, 2011 WL at *32 (conveying author's "lingering intuition—shared by most Americans, I suspect—that Congress should not be able to compel citizens to buy productions they do not want") (Sutton, J). Compelled purchases are the most fundamental function of government of any sort, and the fact that the government here allowed its residents additional freedom of choice over these purchases should diminish, not exacerbate, anxieties about federal tyranny.

Governments exist, most fundamentally, to solve collective action problems. Core governmental functions, like the provision of domestic peace, enforceable property rights, national defense, and infrastructure, are assigned to government because the market fails to produce optimal levels of such public goods.[13] Since public goods are enjoyed by all, most

---

[13]*See generally* R.H. Coase, *The Lighthouse in Economics*, 17 J.L. & Econ. 357, 357-360 (1974); Paul A. Samuelson, *The Pure Theory of Pub-*

individuals refuse to purchase them themselves, hoping instead that they can free-ride when someone else does. By forcibly collecting tax revenue and using it to purchase public goods, governments are able to solve this collective action problem. Thus, at root, governments are formed precisely to *compel purchases of public goods*.

Because hospitals are required to stabilize the uninsured, the uninsured are able to pass along much of the cost of their health care to the insured.[14] Solving this problem, as the Act attempts to do, creates a public good: lower prices for health services for all citizens. Thus, the Act compels the purchase of a public good, just as the federal government does when it collects taxes and uses it to fund national defense.

Indeed, it is undisputed that Congress would have had the power under the Taxing and Spending Clause to raise taxes and use increased revenues to purchase and distribute health insurance for all. It seems quite odd that Congress's attempt to enhance individual freedom by allowing citizens to make their own purchase decisions would give rise to such bloated concerns about a federal power grab. *Cf. Thomas More*, ___ F.3d at ___, 2011 WL at *31 (Sutton, J.) ("Few doubt that Congress could pass an equally coercive law under its taxing power . . . .").

As for the broccoli mandate appellants fear, I have explained at several points why nothing I have written would

---

*lic Expenditure*, 36 Rev. Econ. & Statistics 387 (1954). Public goods are goods that are "non-rival" and "non-excludable." "Non-rival" means that enjoyment of the good by one citizen does not reduce the enjoyment by another; "non-excludable" means that all citizens will enjoy the good once it is produced—none can be excluded. *See, e.g.,* John P. Conley & Christopher S. Yoo, *Nonrivalry and Price Discrimination in Copyright Economics*, 157 U. Pa. L. Rev. 1801, 1805-11 (2009).

[14]In the language of economics, the failure to obtain insurance has "negative externalities"—negative effects on those not responsible for the decision.

authorize it. But I note that mandating the purchase (but *not* the consumption, which would raise serious constitutional issues) of broccoli in order to bolster the broccoli market would, in practical effect, be nothing new. Since the time of the Founding Fathers, when Alexander Hamilton called for federal subsidies for domestic manufacturers, the federal government has used tax revenues to subsidize various industries. *See Algonquin SNG, Inc. v. Federal Energy Administration*, 518 F.2d 1051, 1061 (D.C. Cir. 1975) ("From earliest days, the tariff authority given Congress by the Constitution has been understood to apply to the 'protective tariff' sponsored by Alexander Hamilton, a measure focused . . . on the 'non-revenue purpose' of protecting domestic industry against foreign competition."), *rev'd by Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976). Though centralized subsidies are far more efficient than purchase mandates—which is why a broccoli mandate is purely fantastical—they are, in effect, the same. Since they, too, are clearly within Congress's power under the Taxing and Spending Clause, allowing broccoli purchase mandates would not increase federal power. For these reasons, I find appellants' fears to be unfounded. I would reject their novel and unsupported suggestion that Commerce Clause jurisprudence ought to discriminate among regulated persons according to the amount of effort or resources they have expended in a given economic arena. Under seventy years of well-settled law, it is enough that the behavior regulated (whether characterized as activity or inactivity) substantially affects interstate commerce. Appellants can cite neither case nor constitutional text for their proposed activity/inactivity distinction. They can explain neither why it ought to be relevant to my Commerce Clause analysis nor why it ought to impel courts to ignore seventy-year-old law that takes a wholly different approach. And they cannot even provide a sufficiently concrete definition of "activity" and "inactivity" to allow courts to reliably apply their distinction. Because I find the individual mandate

to be within the bounds of Congress's commerce power defined by *Wickard*, *Lopez*, *Morrison*, and *Raich*, I would reject appellants' Commerce Clause challenge.

## VII. Employer Mandate

Appellants also challenge the Affordable Care Act's employer mandate, arguing that it is not a proper exercise of Congress's power under the Commerce Clause. I disagree.

It is well settled that Congress may regulate terms of employment under the Commerce Clause. *See United States v. Darby*, 312 U.S. 100 (1941) (upholding minimum wage and overtime provisions of the Fair Labor Standards Act); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) (upholding National Labor Relations Act of 1935, which forbid unfair labor practices); *cf.* Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (regulating employer retirement plans and preempting state regulations under the Commerce Clause); *id.* at § 1082 *et seq.* (setting minimum funding standards for employer retirement plans). This is true, of course, of employers "engaged [solely] in intrastate commerce," so long as Congress could reasonably find that their intrastate activities (considered in the aggregate) substantially affect interstate commerce. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 537 (1985); *accord Darby*, 312 U.S. at 118-119; *Jones & Laughlin*, 301 U.S. at 36-38.

Appellants do not challenge Congress's finding that "employers who do not offer health insurance to their workers gain an unfair economic advantage relative to those employers who do provide coverage" and contribute to a negative feedback loop in which "uninsured workers turn to emergency rooms for health care which in turn increases costs for employers and families with health insurance," making it more difficult for employers to insure their employees. H.R. Rep. No. 111-443(II), at 985-86 (2010). Nor do appellants

dispute the fact that this amounts to a substantial effect on interstate commerce. Instead, they attempt to distinguish the employer mandate from the wage and overtime provisions in *Darby* and the fair labor practices in *Jones & Laughlin* and argue that the mandate compels "private employers [to] enter into a contract with other private parties for a particular product." Appellants' Br. 25.

These arguments fail. Appellants cannot convincingly distinguish *Darby* or *Jones & Laughlin*. They repeatedly suggest that regulated employers must be involved in interstate commerce; but, as explained above, it is well settled that employers who conduct only intrastate business may be regulated under the Commerce Clause so long as their economic activities, considered in the aggregate, substantially affect interstate commerce. Appellants emphasize the Court's observation in *Jones & Laughlin* that the National Labor Relations Act "does not compel agreements between employers and employees." *Id.* at 27 (quoting *Jones & Laughlin*, 301 U.S. at 31). Neither does the employer mandate: like the minimum wage and overtime provisions upheld in *Darby*, it merely requires that employment agreements contain certain terms (or that the employer pay a penalty).

Appellants attempt to distinguish *Darby* by arguing that "the wage and hour provisions in *Darby* . . . did not prescribe what must be contained within the employment contract, other than setting a floor for wages and a ceiling for hours." Appellants' Br. 28. But the employer mandate, too, only "set[s] a floor": it requires employers to offer employees "the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan," but employers are free to select any plan (or create their own) and provide any level of coverage above the "minimum essential" level, the mandate's "floor." 26 U.S.C. § 4980H(a)(1).

Appellants' only other objection to the employer mandate is that it allegedly forces employers to contract with third par-

ties. This is untrue: employers are free to self-insure, and many do. *See* Employee Benefit Research Inst., *Health Plan Differences: Fully-Insured vs. Self-Insured* (2009) (reporting that 55% of employees with health insurance were enrolled in self-insured plans in 2008); Christina H. Park, Div. of Health Care Statistics at the Nat'l Ctr. for Health Statistics, Ctrs. for Disease Control and Prevention, *Prevalence of Employer Self-Insured Health Benefits: National and State Variation*, 57 Med. Care Res. & Rev. 340, 352 (2000) (finding that 21% of all private-sector employers who offered health benefits offered a self-insured health plan in 1993; 49% of employees were enrolled in self-insured plans). Even if employers were compelled to enter the market to purchase health insurance, appellants' objection would fail for the very reasons I would reject their similar challenge to the individual mandate.

## VIII.   Religious Exemptions

Appellants also allege violations of the Free Exercise Clause, the Religious Freedom Restoration Act of 1993, the Establishment Clause, and equal protection. The Act makes two religious exemptions: a religious conscience exemption and a health-care sharing ministry exemption. 26 U.S.C. § 5000A(d)(2). The former exempts members of a recognized religious sect in existence since December 31, 1950 who are "conscientiously opposed to acceptance of the benefits of any private or public insurance which makes payments in the event of death, disability, old-age, or retirement or makes payments toward the cost of, or provides services for, medical care." *Id.* § 1402(g)(1). The latter exempts members of a "health care sharing ministry"—a non-profit organization in existence since December 31, 1999 with members who "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed." *Id.* § 5000A(d)(2)(B)(ii).

Appellants claim that these exemptions are "religious gerrymanders" demonstrating that the Act itself is hostile to cer-

tain religions, Appellants' Br. 45, and further that the exemptions themselves are unconstitutional under the Establishment and Equal Protection Clauses. For the following reasons, I reject these arguments.

### A.   Free Exercise Clause

Appellants allege that the Act compels them to violate their "sincerely held religious beliefs against facilitating, subsidizing, easing, funding, or supporting abortions" and prohibits the University from "providing health care choices for employees that do not conflict with the mission of the University and the core Christian values under which it and its employees order their day to day lives." Second Am. Compl. ¶ 142; Pls.' Opp'n 36. This argument is unavailing.

"[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990). Appellants claim that the Act is not neutral because its religious exemptions are "the type of 'religious gerrymanders' that the Supreme Court warned against in *Lukumi*." Appellants' Br. 45 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)). They are not. In *Lukumi*, the Supreme Court struck down city ordinances after finding that "[t]he record in this case compels the conclusion that the suppression of the central element of the Santeria worship service was the object of the ordinances." 508 U.S. at 534. Here appellants never allege that "the object of [the Act] [wa]s to infringe upon or restrict practices because of their religious motivation." *Id.* The Act is a neutral law of general applicability and so does not violate the Free Exercise Clause.

### B.   Religious Freedom Restoration Act

I also reject the claim that application of the individual mandate to appellants would run afoul of the Religious Free-

dom Restoration Act of 1993 (RFRA). The RFRA directs that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the Government "demonstrates that application of the burden to the person (1) is in further-ance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling govern-mental interest." 42 U.S.C. § 2000bb-1.

If appellants had plead sufficient facts to demonstrate a substantial burden to their exercise of religion, I would be forced to consider the relevance of the RFRA to a subsequent act of Congress. *Cf. Gonzales v. O Centro Espirita Benefi-cente Uniao do Vegetal*, 546 U.S. 418 (2006) (applying RFRA to enforcement of pre-RFRA provisions of the Con-trolled Substances Act). But appellants have not.

To survive the Government's 12(b)(6) motion to dismiss, appellants' complaint must "provide the grounds of [their] entitlement to relief," which "requires more than labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). "[C]onclusory" allegations are "not entitled to be assumed true." *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1951 (2009). Unless appellants' allegations "nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Here appellants merely alleged that the individual mandate will force them to violate their "sincerely held religious beliefs against facilitating, subsidizing, easing, funding, or supporting abortions." Second Am. Compl. ¶ 142. Nowhere does the complaint explain how the Act would do this. The Act contains provisions to ensure that federal funds are not used for abortions (except in cases of rape or incest, or when the life of the woman would be endangered), *see* Affordable Care Act § 1303; *see also* Exec. Order No. 13,535 of Mar. 24, 2010, 75 Fed. Reg. 15,599 (implementing Section 1303's

abortion restrictions), and that each state's health benefit exchange will include at least one plan that does not cover (non-excepted) abortions, *see* Affordable Care Act § 1334(a)(6). Without additional or more particularized allegations, I cannot say that appellants' complaint makes it plausible that the Act "substantially burdens [their] exercise of religion." 42 U.S.C. § 2000bb-1(b).

### C.   Establishment Clause and Equal Protection

Appellants also challenge the Act's religious exemptions themselves, claiming that they violate the Establishment Clause and equal protection because "they grant preferred status only to certain religious adherents." Appellants' Br. 45. I disagree. Like the "permissible legislative accommodation of religion" upheld by the Supreme Court in *Cutter v. Wilkinson*, the Act's exemptions alleviate "government-created burdens on private religious exercise," "do[ ] not override other significant interests," and neither "confer[ ] . . . privileged status on any particular religious sect, [nor] single[ ] out [any] bona fide faith for disadvantageous treatment." 544 U.S. 709, 719-23 (2005).

The religious conscience exemption simply incorporates the exemption created by section 1402(g)(1), which has survived every Establishment Clause challenge to it over the last forty years. *See, e.g.*, *Droz v. Comm'r*, 48 F.3d 1120, 1124 (9th Cir. 1995); *Hatcher v. Comm'r*, 688 F.2d 82, 83-84 (10th Cir. 1979); *Jaggard v. Comm'r*, 582 F.2d 1189, 1190 (8th Cir. 1978); *Palmer v. Comm'r*, 52 T.C. 310, 314-15 (1969). For the reasons set out by our sister courts in these cases, I would reject appellants' Establishment Clause challenge to the Act's exemptions.

The exemptions easily survive appellants' equal protection challenge as well. Legislation comports with equal protection requirements so long as it employs "a rational means to serve a legitimate end." *City of Cleburne v. Cleburne Living Ctr.*,

473 U.S. 432, 442 (1985). And "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the [legislature] has the authority to implement, the courts have been very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *Id.* at 441-42. Here Congress could have reasonably believed that members of groups that provide health care to their members are less likely to require public medical care, and thus less likely to produce the externalities the Act was designed to diminish. And Congress could have reasonably believed that if it did not limit these exemptions to groups formed prior to a pre-enactment date, individuals who simply wished to avoid the individual mandate would form groups that insincerely claimed the required religious beliefs. Thus the distinctions Congress drew in the Act's religious exemptions accord all equal protection under the law.

## IX.   Conclusion

For the foregoing reasons, I would hold that the AIA does not deprive federal courts of jurisdiction to adjudicate the constitutionality of the Affordable Care Act. I would further hold that each of appellants' challenges to the Act lacks merit and that, specifically, both the individual and employer mandates pass muster as legitimate exercises of Congress's commerce power.

Regrettably, my fine colleagues in the majority perceive a jurisdictional bar in this case that simply is not there. Accordingly, I respectfully dissent.